No. 25-11114

==============================================================

**IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT**

--------------------------------------------------------------

ISAAC A., by and through next friend, A.A.; ZACH B., by and through next friend, B.B.;
LEON C., by and through next friend, C.C.; SAMUEL D., by and through next friend,
D.D., on behalf of themselves and those similarly situated; and
THE GEORGIA ADVOCACY OFFICE,

*Plaintiffs-Appellee,*

v.

RUSSEL CARLSON, in his official capacity as Commissioner of the Georgia Department
of Community Health; KEVIN TANNER, in his official capacity as Commissioner of
the Georgia Department of Behavioral Health and Developmental Disabilities; and
CANDICE L. BROCE, in her official capacity as the Commissioner of the Georgia
Department of Human Services,

*Defendants-Appellants.*

--------------------------------------------------------------

On Appeal from the United States District Court for the
Northern District of Georgia, No. 1:24-cv-00037 (Totenberg, J.)

--------------------------------------------------------------

**CORRECTED OPENING BRIEF OF DEFENDANTS-APPELLANTS**

--------------------------------------------------------------

Christopher M. Carr
  *Attorney General*
Stephen J. Petrany
  *Solicitor General*
Bryan K. Webb
  *Deputy Attorney General*
Georgia Department of Law
40 Capitol Square SW
Atlanta, Georgia, 30334
404-458-3408

Patrick Strawbridge
Consovoy McCarthy PLLC
Ten Post Office Square
8th Floor South PMB #706
Boston, MA 02109
(617) 227-0548
patrick@consovoymccarthy.com

Frank H. Chang
Soren Geiger
Consovoy McCarthy PLLC
1600 Wilson Blvd., Suite 700
Arlington, VA 22209
(703) 243-9423

==============================================================

## CERTIFICATE OF INTERESTED PERSONS

Per Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1, Appellants certify that the following parties have an interest in the outcome of this appeal:

1. A., Isaac, by and through next friend, A.A. (pseudonymous), *Plaintiff-Appellee*

2. B., Zach, by and through next friend, B.B. (pseudonymous), *Plaintiff-Appellee*

3. Bernstein, C'Zar, *Former counsel for Defendants-Appellants*

4. Bogan, James F., *Counsel for Plaintiffs-Appellees*

5. Broce, Candice L., *Defendant-Appellant*

6. Buchanan, Ryan K., *Counsel for Interested Party (United States)*

7. C., Leon, by and through next friend, C.C. (pseudonymous), *Plaintiff-Appellee*

8. Caldas, Tamara S., *Counsel for Plaintiffs-Appellees*

9. Carlson, Russel, *Defendant-Appellant*

10. Carr, Christopher M., *Counsel for Defendants-Appellants*

11. Center for Public Representation, *Law firm representing Plaintiffs-Appellees*

12. Chang, Frank H., *Counsel for Defendants-Appellants*

13. Clarke, Kristen, *Counsel for Interested Party (United States)*

14. Consovoy McCarthy PLLC, *Law firm representing Defendants-Appellants*

15. Costanzo, Cathy E., *Counsel for Plaintiffs-Appellees*

16. D., Samuel, by and through next friend, D.D. (pseudonymous), *Plaintiff-Appellee*

17. Duane Morris LLP, *Law firm representing Plaintiffs-Appellees*

*Isaac A. v. Carlson*, No. 25-11114

18. Ederle, Kathryn C., *Counsel for Plaintiffs-Appellees*

19. Floyd, Michele, *Counsel for Plaintiffs-Appellees*

20. Gadd, M. Geron, *Counsel for Plaintiffs-Appellees*

21. Geiger, Soren, *Counsel for Defendants-Appellants*

22. Georgia Advocacy Office, The, *Plaintiff-Appellee* and *law firm representing Plaintiffs-Appellees*

23. Georgia Department of Law, *Office of Georgia Attorney General representing Defendants-Appellants*

24. Holloway, Clay D., *Counsel for Plaintiffs-Appellees*

25. Hughes, Aileen Bell, *Counsel for Interested Party (United States)*

26. Hyams, Samuel Z., *Counsel for Plaintiffs-Appellees*

27. Igram, Mona, *Counsel for Plaintiffs-Appellees*

28. Kilpatrick Townsend & Stockton LLP, *Law firm representing Plaintiffs-Appellees*

29. Lewis, Kimberly, *Counsel for Plaintiffs-Appellees*

30. Lucas, Catherine G., *Counsel for Plaintiffs-Appellees*

31. Lurey, Alfred S., *Counsel for Plaintiffs-Appellees*

32. National Health Law Program, *Law firm representing Plaintiffs-Appellees*

33. Orland, Devon, *Counsel for Plaintiffs-Appellees*

34. Petrany, Stephen, J., *Counsel for Defendants-Appellants*

35. Rosenbaum, Steven H., *Counsel for Interested Party (United States)*

36. Rucker, Kathryn L., *Counsel for Plaintiffs-Appellees*

37. Strawbridge, Patrick, *Counsel for Defendants-Appellants*

38. Tanner, Kevin, *Defendant-Appellant*

*Isaac A. v. Carlson*, No. 25-11114

39. Tayloe, Benjamin O., *Counsel for Interested Party (United States)*

40. Totenberg, Amy, United States District Judge (N.D. Ga.)

41. United States of America, *Interested Party*

42. U.S. Attorney for the Northern District of Georgia, *Federal Agency representing Interested Party (United States)*

43. U.S. Department of Justice, Civil Rights Division, *Federal Agency representing Interested Party (United States)*

44. Van Keuren, Zeke, *Counsel for Plaintiffs-Appellees*

45. Webb, Bryan K., *Counsel for Defendants-Appellants*

46. Kurtz, Beth, *Counsel for Interested Party (United States)*

Dated: June 11, 2025                    */s/ Patrick Strawbridge*

## STATEMENT REGARDING ORAL ARGUMENT

Defendants-Appellants request oral argument in this case. The district court denied sovereign-immunity defenses asserted by various Georgia agencies' commissioners. Oral argument will aid the Court's review of these and other pendent legal issues that are of significant importance.

# TABLE OF CONTENTS

Statement Regarding Oral Argument ............................................................. i

Table of Contents ......................................................................................... ii

Table of Authorities .................................................................................... iv

Introduction ................................................................................................. 1

Jurisdictional Statement ............................................................................... 3

Statement of the Issues ................................................................................ 3

Statement of the Case .................................................................................. 4

    I.      Legal Background ........................................................................... 4

          A.     Medicaid Act ....................................................................... 4

          B.     ADA and Rehabilitation Act .............................................. 6

    II.     Georgia's Medicaid Program ......................................................... 7

          A.     Georgia Agencies ............................................................... 7

          B.     Georgia's Behavioral and Mental Health Services ............. 8

    III.    Plaintiffs' Lawsuit ......................................................................... 9

          A.     Plaintiffs' Allegations ........................................................ 9

          B.     The District Court's Order ............................................... 12

          C.     Standard of Review .......................................................... 13

Summary of the Argument .......................................................................... 14

Argument .................................................................................................... 16

    I.      Sovereign immunity bars Plaintiffs' Medicaid and ADA claims. ... 16

          A.     Congress has not validly abrogated Georgia's sovereign immunity against Plaintiffs' ADA claims. ............................ 17

          B.     The *Ex parte Young* exception does not apply to Medicaid and ADA claims .................................................................. 30

    II.     Plaintiffs lack standing. ................................................................ 37

          A.     Plaintiffs' injuries are not traceable to the Commissioners. ... 37

          B.     Plaintiffs' injuries are not redressable by an order against the Commissioners. ................................................................ 40

          C.     GAO and the proposed class lack standing. ..................... 42

III.    Plaintiffs fail to state a claim. ...................................................................43

      A.    Plaintiffs' Medicaid claims fail because they fail to allege that the Remedial Services are medically necessary. ..............................................43

      B.    Plaintiffs' ADA and Rehabilitation Act claims fail. .............................46

Conclusion ....................................................................................................................47

Certificate of Compliance ..........................................................................................48

Certificate of Service ..................................................................................................48

# TABLE OF AUTHORITIES

## Cases

*Alexander v. Choate,*
469 U.S. 287 (1985) ..........................................................................28

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009) ....................................................................54, 55

*Babcock v. Michigan,*
812 F.3d 531 (2016) .........................................................................42

*Bd. of Trs. of Univ. of Ala. v. Garrett,*
531 U.S. 356 (2001) .........................................................................20

*Beal v. Doe,*
432 U.S. 438 (1977) .........................................................................53

*Biden v. Nebraska,*
600 U.S. 477 (2023) .........................................................................27

*Bircoll v. Miami-Dade County,*
480 F.3d 1072 (11th Cir. 2007) .....................................................26

*Block v. Tex. Bd. of L. Exam'rs,*
952 F.3d 613 (5th Cir. 2020) ........................................................21

*Boyd v. Steckel,*
753 F. Supp. 2d 1163 (M.D. Ala. 2010) .......................................29

*Carpenter-Barker v. Ohio Dep't of Medicaid,*
752 F. App'x 215 (6th Cir. 2018) .................................................31

*City of South Miami v. Governor,*
65 F.4th 631 (11th Cir. 2023) ...........................................34, 37-41

*Cohon ex rel. Bass v. N.M. Dep't of Health,*
646 F.3d 717 (10th Cir. 2011) ......................................................30

*Cordoba v. DIRECTV,*
942 F.3d 1259 (11th Cir. 2019) ....................................................47

*DeKalb Cnty. Sch. Dist. v. Schrenko,*
109 F.3d 680 (11th Cir. 1997) ......................................................19

*Disability Advocs., Inc. v. Paterson,*
598 F. Supp. 2d 289 (E.D.N.Y. 2009) ..........................................30

*Disability Rts. Cal. v. County of Alameda,*
2021 WL 212900 (N.D. Cal. Jan. 21) ...........................................25

*Disability Rts. Fla. v. Palmer*,
  2019 WL 11253085 (N.D. Fla. Aug. 29) ................................................. 25, 34

*Families A Through V v. DeSantis*,
  658 F. Supp. 3d 1063 (N.D. Fla. 2023) ...........................................................37

*Franklin v. Massachusetts*,
  505 U.S. 788 (1992) ........................................................................................51

*Garrido v. Dudek*,
  731 F.3d 1152 (11th Cir. 2013) ........................................................................7

*Guttman v. Khalsa*,
  669 F.3d 1101 (10th Cir. 2012) ......................................................................35

*Idaho v. Coeur d'Alene Tribe of Idaho*,
  521 U.S. 261 (1997) ........................................................................................19

*Jacobson v. Fla. Sec'y of State*,
  974 F.3d 1236 (11th Cir. 2020) ........................................................40, 47, 50

*Kimel v. Fla. Bd. of Regents*,
  528 U.S. 62 (2000) ..........................................................................................36

*Kohn v. State Bar of Cal.*,
  119 F.4th 693 (9th Cir. 2024) .........................................................................21

*Lewis v. Governor of Ala.*,
  944 F.3d 1287 (11th Cir. 2019) ................................................................49, 51

*Loggerhead Turtle v. Cnty. Council of Volusia Cnty.*,
  148 F.3d 1231 (11th Cir. 1998) ......................................................................46

*Luckey v. Harris*,
  860 F.2d 1012 (11th Cir. 1988) ......................................................................42

*M.H. by and through Lynah v. Comm'r of Ga. DCH*,
  111 F.4th 1301 (11th Cir. 2024) .............................................................6, 7, 41

*M.S. v. Premera Blue Cross*,
  118 F.4th 1248 (10th Cir. 2024) .......................................................................4

*McClendon v. Ga. DCH*,
  261 F.3d 1252 (11th Cir. 2001) ......................................................................20

*McCullough v. Finley*,
  907 F.3d 1324 (11th Cir. 2018) ....................................................... 4, 16, 42, 54

*Mi Familia Vota v. Abbott*,
  977 F.3d 461 (5th Cir. 2020) ....................................................................37, 40

*Moore ex rel. Moore v. Reese,*
  637 F.3d 1220 (11th Cir. 2011) ............................................. 1, 4-5, 31, 34, 38, 41, 43-44

*Muscogee (Creek) Nation v. Rollins,*
  119 F.4th 881 (11th Cir. 2024) ................................................................. 36, 37

*Nat'l Ass'n of the Deaf v. Florida,*
  980 F.3d 763 (11th Cir. 2020) ................................................................................ 35

*Olmstead v. L.C. ex rel. Zimring,*
  527 U.S. 581 (1999) ............................................... 1, 6-7, 19, 21-25, 27-29, 35

*Osterback v. Scott,*
  782 F. App'x 856 (11th Cir. 2019) .................................................................... 40

*Pennhurst v. Halderman,*
  465 U.S. 89 (1984) ............................................................................................... 19

*Regions Bank v. Legal Outsource PA,*
  936 F.3d 1184 (11th Cir. 2019) ......................................................................... 32

*Rodriguez v. NYC,*
  197 F.3d 611 (2d Cir. 1999) .................................................................... 2, 19-22

*Rose v. Rhorer,*
  2014 WL 1881623 (N.D. Cal. May 9) ............................................................. 27

*Schultz v. Alabama,*
  42 F.4th 1298 (11th Cir. 2022) ............................................................................ 4

*Schwarz v. Ga. Composite Med. Bd.,*
  2021 WL 4519893 (11th Cir. Oct. 4) ......................................................... 21, 35

*Steimel v. Wernert,*
  823 F.3d 902 (7th Cir. 2016) ............................................................................. 24

*Summers v. Earth Island Inst.,*
  555 U.S. 488 (2009) ............................................................................................ 51

*Summit Med. Assocs., P.C. v. Pryor,*
  180 F.3d 1326 (11th Cir. 1999) ............................................................ 16, 37, 39

*Support Working Animals v. Governor of Fla.,*
  8 F.4th 1198 (11th Cir. 2021) ..................................................................... 39-42

*Swann v. Sec'y,*
  668 F.3d 1285 (11th Cir. 2012) ............................................................. 45, 47, 48

*Tennessee v. Lane,*
  541 U.S. 509 (2004) ............................................................................................ 35

*Townsend v. Quasim,*
    328 F.3d 511 (9th Cir. 2003) ......................................................... 24, 25

*United States v. Florida,*
    682 F. Supp. 3d 1172 (S.D. Fla. 2023) ...................................................30

*United States v. Florida,*
    No. 23-12331 (11th Cir.) ..............................................................30

*United States v. Georgia,*
    546 U.S. 151 (2006) ............................................................2, 21, 35

*United States v. Mississippi,*
    82 F.4th 387 (5th Cir. 2023) ..............................................23-24, 26-27

*Va. Off. for Prot. & Advoc. v. Stewart,*
    563 U.S. 247 (2011) ....................................................................36

*Wade v. Fla. Dep't of Juv. Just.,*
    745 F. App'x 894 (11th Cir. 2018) .....................................................56

*Walters v. Fast AC, LLC,*
    60 F.4th 642 (11th Cir. 2023) .....................................................45, 46

*Waskul v. Washtenaw Cnty. Cmty. Mental Health,*
    979 F.3d 426 (6th Cir. 2020) ..........................................................33

*Williams v. Reckitt Benckiser LLC,*
    65 F.4th 1243 (11th Cir. 2023) ........................................................51

*Women's Emergency Network v. Bush,*
    323 F.3d 937 (11th Cir. 2003) .........................................................37

*WWH v. Jackson,*
    595 U.S. 30 (2021) ...........................................................36, 41, 44

*Y.A. by Alzandani v. Hamtramck Pub. Schs.,*
    2025 WL 1463285 (6th Cir. May 22) ..............................................21, 22, 35

**Statutes**

29 U.S.C. §794(a) ...........................................................................6

42 U.S.C. §12101(b)(1) ....................................................................26

42 U.S.C. §12131(2) ...................................................................21, 22

42 U.S.C. §12132 ..........................................................6, 18-19, 22, 26

42 U.S.C. §12202 .......................................................................2, 17

42 U.S.C. §1396a .....................................................................4, 7, 43, 46

42 U.S.C. §1396d(a)(1)-(32) ........................................................................43

42 U.S.C. §1396d(a)(13)(C) ........................................................................43

42 U.S.C. §1396d(a)(4)(B) .......................................................................4, 43

42 U.S.C. §1396d(r) .............................................................................4, 5, 43

O.C.G.A. §15-11-212(a)(2)(C) ......................................................................7

O.C.G.A. §37-1-2(a)(11) .................................................................................7

O.C.G.A. §49-2-7(b) ........................................................................................7

O.C.G.A. §49-4-142(a) ..............................................................................7, 35

O.C.G.A. §49-4-153 ......................................................................................31

O.C.G.A. §49-4-169 ........................................................................................5

O.C.G.A. §49-4-169.1(4) ....................... 1, 5, 11, 31-32, 34, 38, 40-41, 44

O.C.G.A. §49-4-169.1(5) .........................................................................31, 45

O.C.G.A. §49-4-169.2 ......................................................................................5

O.C.G.A. §49-4-169.3(c), (e), (f) ...............................................................5, 31

O.C.G.A. §49-5-8(a)(9) .............................................................................7, 35, 36

## Rules

28 C.F.R. §35.130(b)(7)(i) ........................................................................8, 26

28 C.F.R. §35.130(d) ......................................................................................8

28 C.F.R. §41.51(d) .........................................................................................8

42 C.F.R. §§440.230(d) ..............................................................................5, 44

42 C.F.R. §§441.152 .....................................................................................44

42 C.F.R. §§441.153 .....................................................................................44

## Other Authorities

DBHDD, *Provider Manual for Community Behav. Health Providers* 97 (FY2024 Q3), perma.cc/HK22-UVXG ..................................................................11, 33

DBHDD, *Requirements to Access DBHDD Funds for Child & Adolescent Behav. Health Servs.*, 01-106 (Jan. 1., 2011), gadbhdd.policystat.com/policy/9027197/latest. 10, 41

SAMHSA, *Fact Sheet: Spotlight on Georgia's Mental Health and Substance Use Crisis Care*, perma.cc/TJ5C-EKXA ...............................................................11, 12

## INTRODUCTION

The individual Plaintiffs A-D are Medicaid-receiving children who suffer from mental disabilities. These Plaintiffs, along with the Georgia Advocacy Office, brought a putative class-action suit against the Commissioners of various Georgia state agencies under the Medicaid Act, Americans with Disabilities Act, and Rehabilitation Act. Although Georgia currently provides several crucial community-based services through Medicaid, Plaintiffs allege that they instead want completely different services (which they call "the Remedial Services") that the State does not provide to anyone. Plaintiffs seek to enlist a federal district court to compel Georgia to include these services in the State's Medicaid plan for all Medicaid-eligible individuals under the age of 21 who suffer from serious emotional disturbances. But Plaintiffs don't even allege that *any doctor* has prescribed these Remedial Services as medically necessary for them.

Courts cannot compel Georgia to provide new services under its Medicaid program when no doctor has prescribed them as medically necessary. The Medicaid Act gives broad discretion to the States to limit the provision of services to those that are medically necessary. *See Moore ex rel. Moore v. Reese*, 637 F.3d 1220, 1255 (11th Cir. 2011). Under Georgia law, to be medically necessary, a physician must have prescribed the service. *See* O.C.G.A. §49-4-169.1(4). The Commissioners lack the authority to provide services that aren't medically necessary. Though Plaintiffs also allege that the Commissioners' alleged failure to provide the Remedial Services violates the ADA and Rehabilitation Act, neither the ADA nor the Rehabilitation Act "requires States to 'provide a certain level of benefits to individuals with disabilities'" or "imposes on the States a 'standard of care' for whatever medical services they render." *Olmstead v. L.C. ex rel.*

1

*Zimring*, 527 U.S. 581, 603 n.14 (1999). A State cannot have unlawfully discriminated "by denying a benefit that it provides to no one." *Rodriguez v. NYC*, 197 F.3d 611, 618 (2d Cir. 1999).

The district court erroneously denied the Commissioners' motion to dismiss. This Court should reverse for four reasons.

**First**, the Commissioners are immune from Plaintiffs' ADA claims. Though Congress purported to abrogate the States' sovereign immunity, 42 U.S.C. §12202, this Court applies a three-step test to determine whether that abrogation was valid, *see United States v. Georgia*, 546 U.S. 151 (2006). Under that test, Plaintiffs fail to state a claim under the ADA, fail to allege violations of the Fourteenth Amendment, and assert a right to more benefits which is not congruent or proportional to the constitutional problems that Congress was supposedly looking to fix.

**Second**, the *Ex parte Young* exception to sovereign immunity doesn't apply because the Commissioners lack the authority to provide Medicaid services that no doctor has prescribed as medically necessary or appropriate.

**Third**, Plaintiffs lack standing because their injuries are (A) not traceable to the Commissioners who do not make the initial medical-necessity or community-placement determination and (B) not redressable by a judgment against the Commissioners.

**Fourth**, Plaintiffs fail to state a claim under the Medicaid Act, ADA, and Rehabilitation Act because they fail to allege medical necessity.

2

## JURISDICTIONAL STATEMENT

This appeal is timely because the district court issued its order denying Defendants-Appellants' motion to dismiss on March 25, 2025, and Defendants-Appellants filed a notice of appeal less than 30 days later, on April 2, 2025. This Court has jurisdiction to review the district court's denial of the Commissioners' sovereign-immunity defenses. *See Schultz v. Alabama*, 42 F.4th 1298, 1313 (11th Cir. 2022). This Court also has pendent appellate jurisdiction to review standing and the sufficiency of the complaint because they are inextricably intertwined with the sovereign-immunity issues. *See id.*; *McCullough v. Finley*, 907 F.3d 1324, 1330 (11th Cir. 2018); *see generally* CA11.Doc.32.

## STATEMENT OF THE ISSUES

I.  Whether sovereign immunity bars Plaintiffs' Medicaid and ADA claims.

   A.  Whether Georgia's sovereign immunity remains untouched despite the ADA's purported abrogation when Plaintiffs fail to state a claim under the ADA, fail to allege constitutional violations, and otherwise seek to compel the State to create new programs.

   B.  Whether the Commissioners are improper defendants under *Ex parte Young* when they lack the authority to provide Medicaid services that no doctor has prescribed as medically necessary.

II.  Whether Plaintiffs lack standing when their injuries are neither traceable to the Commissioners, who do not make the initial medical-necessity determinations, nor redressable by a judgment against the Commissioners.

III.  Whether Plaintiffs failed to state a claim under the Medicaid Act, ADA, and Rehabilitation Act.

## STATEMENT OF THE CASE

Plaintiffs, Medicaid-recipient children with mental disabilities, sued the Commissioners of various Georgia agencies under the Medicaid Act, ADA, and Rehabilitation Act to compel the Commissioners to create new services under Medicaid. The district court denied the Commissioners' motion to dismiss based on sovereign-immunity defenses and Plaintiffs' pleading deficiencies.

### I.  Legal Background

### A.  Medicaid Act

The Medicaid Act establishes a "jointly financed federal-state cooperative program, designed to help [S]tates furnish medical treatment to their needy citizens." *Moore v. Reese*, 637 F.3d at 1232. The States "devise and fund their own medical assistance programs," and the federal government provides "partial reimbursement." *Id.* A "'State plan for medical assistance' must meet various guidelines, including the provision of certain categories of care and services." *Id.* (quoting 42 U.S.C. §1396a). Some services are mandatory; others are discretionary. *Id.* As relevant here, in 1989, Congress "broaden[ed] the category of services" and required the participating States to provide "[early and periodic screening, diagnostic, and treatment services] to all Medicaid-eligible persons under the age of 21." *Id.* at 1233; *see also* 42 U.S.C. §1396d(a)(4)(B), (r). The EPSDT services include screening services, vision services, dental services, hearing services, and "[s]uch other necessary health care diagnostic services, treatment, and other measures described in subsection (a) [of §1396d] to correct or ameliorate defects and physical and mental illnesses and conditions discovered by the screening services,

4

whether or not such services are covered under the State plan." 42 U.S.C. §1396d(r)(1)-(5); *see also Moore*, 637 F.3d at 1233.

The provision of services—whether mandatory or discretionary—turns on medical necessity. Under the Medicaid Act, a State retains the discretion to "place appropriate limits on a service based on such criteria as medical necessity." *Id.* at 1235 (quoting 42 C.F.R. §440.230(d)). Thus, "[e]ven if the [Medicaid] Act mandates that a [S]tate provide a certain kind of 'medical services or treatments,' the [S]tate must provide those 'medical services or treatments … only if they are 'medically necessary.'" *M.H. by and through Lynah v. Comm'r of Ga. DCH*, 111 F.4th 1301, 1304 (11th Cir. 2024) (quoting *Moore*, 637 F.3d at 1233). The Medicaid Act and its implemental regulations further "permit [S]tates to set 'reasonable standards for … 'medical necessity.'" *Id.* at 1308 (quoting *Garrido v. Dudek*, 731 F.3d 1152, 1154 (11th Cir. 2013)).

The Georgia General Assembly found it imperative to provide "*medically necessary* therapy services" under the EPSDT program to "categorically needy and medically fragile children." O.C.G.A. §49-4-169 (emphasis added). Under Georgia law, "[a]ll persons who are 21 years of age or younger who are eligible for services under the EPSDT Program shall receive therapy services in accordance with the provisions of [Article 49]." *Id.* §49-4-169.2. Georgia provides EPSDT services to Medicaid-eligible children to the extent they are "medically necessary." *Id.* §49-4-169.3(c), (e), (f). Georgia defines "[m]edically necessary" EPSDT "services" to mean "services or treatments that are prescribed by a physician or other licensed practitioner, and which, pursuant to the EPSDT Program, diagnose or ameliorate defects, physical and mental illnesses, whether or not such services are in the state plan." *Id.* §49-4-169.1(4).

5

### B.    ADA and Rehabilitation Act

Title II of the Americans with Disabilities Act provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. §12132. The Rehabilitation Act is similar: "No otherwise qualified individual with a disability … shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. §794(a). Under implementing regulations, the public entity must administer services in "the most integrated setting appropriate." 28 C.F.R. §35.130(d) (ADA); *see also id.* §41.51(d) (Rehabilitation Act). Furthermore, "[a] public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." *Id.* §35.130(b)(7)(i).

Neither the ADA nor the Rehabilitation Act "requires States to 'provide a certain level of benefits to individuals with disabilities'" or "imposes on the States a 'standard of care' for whatever medical services they render." *Olmstead*, 527 U.S. at 603 n.14. Instead, the ADA, and thus the Rehabilitation Act, requires "nondiscrimination" "with regard to the services [the States] in fact provide." *Id.* Applying this principle, a plurality in *Olmstead* observed that in narrow circumstances, given the choice between existing institutional care and existing community-based care, the State might be required to place certain individuals in community settings if the patients' physician recommends

6

community placement, the patients don't oppose it, and the State can reasonably ac-

commodate placing the patient in the community. *Id.* at 607 (plurality). But "nothing in

the ADA or its implementing regulations condones termination of" residential care "for

persons unable to handle or benefit from community settings." *Id.* at 601-02 (majority).

It would be "unreasonable" and "tragic" for those individuals to be placed in "settings

with too little assistance and supervision." *Id.* at 610 (Kennedy, J., concurring in the

judgment). "The opinion of a responsible treating physician in determining the appro-

priate conditions for treatment ought to be given the greatest of deference." *Id.*

## II.    Georgia's Medicaid Program

### A.    Georgia Agencies

Federal law requires the participating States to designate "a single State agency"

to administer Medicaid. 42 U.S.C. §1396a(a)(5). The Georgia Department of Commu-

nity Health administers Georgia's Medicaid program. O.C.G.A. §49-4-142(a).

The Georgia Department of Human Services oversees the Division of Family

and Child Services. *Id.* §49-2-7(b). DFCS is "authorized by law to receive and provide

care for" children whom Georgia state courts place in DFCS's care by "[g]rant[ing] or

transfer[ing] temporary legal custody" to DFCS. *Id.* §15-11-212(a)(2)(C). DHS is au-

thorized to obtain and provide "medical, hospital, psychiatric, surgical, or dental ser-

vices" to the children under its supervision "as may be considered appropriate and nec-

essary by competent medical authority." *Id.* §49-5-8(a)(9).

The Georgia Department of Behavioral Health and Developmental Disabilities

provides services to a small subset of children with mental health and developmental

disabilities. *Id.* §37-1-2(a)(11). Namely, DBHDD temporarily pays for services for

uninsured children while they are seeking to be insured through Medicaid. *See* DBHDD, *Requirements to Access DBHDD Funds for Child & Adolescent Behavioral Health Services*, 01-106 (Jan. 1., 2011), gadbhdd.policystat.com/policy/9027197/latest.

### B.    Georgia's Behavioral and Mental Health Services

Georgia provides various specialty services to meet the needs of children with behavioral and mental health conditions. As relevant here, the State provides Intensive Customized Care Coordination (IC3), Intensive Family Intervention (IFI), and Georgia Crisis and Access Line (GCAL).

**IC3.** Intensive Customized Care Coordination is "Georgia's intensive care coordination service." D.Ct.Doc.1 ¶150. Under IC3, the family selects a team, and together "the family and team identify the goals and appropriate strategies to reach the goals." DBHDD, *Provider Manual for Community Behavioral Health Providers* 97 (FY2024 Q3), perma.cc/HK22-UVXG. The program "assists individuals in identifying and gaining access to required services and supports." *Id.*

**IFI**. Intensive Family Intervention, as its name suggests, "is a short-term, crisis-focused intervention" that involves the child's family. D.Ct.Doc.1 ¶145. IFI is intended to "clinically stabiliz[e] the living arrangement, promot[e] reunification or prevent[] the utilization of out of home therapeutic venues." *Provider Manual*, supra, at 108. IFI defuses ongoing behavioral crises, links the child and family with necessary psychiatric, psychological, medical, and other resources, and improves the family's capacity to care for the child. IFI is "delivered … primarily to youth in their living arrangement and within the family system." *Id.*

8

***GCAL.*** Georgia Crisis and Access Line is the State's "emergency crisis intervention and referral service for youth and adults." D.Ct.Doc.1 ¶177. The federal government considers Georgia's mobile crisis response a "national leader" that "exemplifies many of the best practices." SAMHSA, *Fact Sheet: Spotlight on Georgia's Mental Health and Substance Use Crisis Care*, perma.cc/TJ5C-EKXA. GCAL is provided "24/7/365 throughout the state," *id.*, and dispatches crisis stabilization units, D.Ct.Doc.1 ¶177.

## III.     Plaintiffs' Lawsuit

### A.     Plaintiffs' Allegations

On January 3, 2024, Plaintiffs (Medicaid-recipient children with mental health disorders) filed a putative class action seeking "to compel" the State to provide what they call "Remedial Services." *Id.* ¶3. Plaintiffs define Remedial Services to include "Intensive Care Coordination, Intensive In-Home Services, and Mobile Crisis Response Services." *Id.* ¶1. Plaintiffs assert that the State must provide these services, as defined in the federal government's 2013 "informational bulletin." *Id.* ¶1 & n.1.

Plaintiffs allege that Intensive Care Coordination (IC2) is a "team-based, collaborative process for developing and implementing individualized care plans for children and youth with complex needs and their families." *Id.* ¶147. Though Georgia already provides IC3, Plaintiffs allege that this is "not the Remedial Service[]" they want. *Id.* ¶145; *see also id.* ¶¶1, 7, 239. Plaintiffs further assert that Intensive In-Home Services (IHS) are "therapeutic interventions delivered to children and families in their homes and other community settings." *Id.* ¶162. Though Georgia already provides IFI, Plaintiffs allege that IFI is "not the Remedial Service[]" they want and that IFI is not the "functional equivalent" of IHS. *Id.* ¶145. Specifically, Plaintiffs allege that IFI doesn't

9

include all necessary treatments and is too time-limited. *Id.* ¶¶163-68. Plaintiffs also allege that Mobile Crisis Response Services must include a "crisis team" that is available 24/7 to children. *Id.* ¶173. Though Georgia already has GCAL, which includes mobile crisis services available 24/7, Plaintiffs allege that these are "not the Remedial Services" they want. *Id.* ¶145.

Plaintiffs are individual Plaintiffs (A, B, C, and D) and the Georgia Advocacy Office. The individual Plaintiffs are children who allege that they suffer from "multiple mental health conditions." *Id.* ¶¶24-25, 36, 47, 57. They allege that they "currently nee[d], but [are] not receiving, the Remedial Services." *Id.* ¶¶33, 44, 54, 64. Plaintiffs A and B allege that they are in DFCS's legal custody and are receiving inpatient treatment. *Id.* ¶¶33, 44. Plaintiff C alleges that although his treatment team recommended discharge, he remains in inpatient treatment because his mother, C.C., opposed his release without the Remedial Services. *Id.* ¶53. Plaintiff D alleges that he is home with his family. *Id.* ¶63. GAO sues "on behalf of its constituents." *Id.* ¶¶6, 70.

Out of 208 paragraphs, only about 50 pertain clearly to Plaintiffs A, B, C, and D. *Id.* ¶¶22-64, 66-70. The complaint alleges that the State must provide "the Children" all the Remedial Services. *E.g.*, *id.* ¶¶8-9, 16, 223, 231. It alleges that they "are deprived of necessary services in their homes and communities." *Id.* ¶1. It also alleges that they are "subjected to unnecessary institutionalization because responsible agencies" don't provide the Remedial Services. *Id.* ¶1. And it claims that Georgia's failure to provide the Remedial Services violates the Medicaid Act, ADA, and Rehabilitation Act. *Id.* ¶¶209-33. Plaintiffs seek sweeping declaratory and injunctive relief. *Id.* ¶¶234-40. They want to "compel" the State to provide the Remedial Services. *Id.* ¶¶6, 16, 238-39. The

injunction would require Georgia to "[e]stablish and implement policies, procedures, and practices" to provide them. *Id.* ¶239(d). And it would require Georgia to make new rules to establish "comprehensive discharge planning and connection to the Remedial Services upon discharge from" inpatient care *Id.* ¶239(g).

In March 2024, the Commissioners moved to dismiss the complaint. D.Ct.Doc.32-1. The Commissioners explained that sovereign immunity barred Plaintiffs' Medicaid and ADA claims, Plaintiffs lack standing, and Plaintiffs failed to state a claim. The Commissioners explained that they enjoy Georgia's sovereign immunity, which was not abrogated, and that the *Ex parte Young* exception did not apply because Plaintiffs failed to "'direct [the] Court to any enforcement authority' that [the Commissioners] possess to prescribe the Remedial Services as medically necessary or to prescribe community placement over inpatient care." *Id.* at 17; *id.* at 13-19.[1] In short, Plaintiffs failed to allege that any physician recently or ever prescribed any of the Remedial Services as medically necessary. That's dispositive because the Commissioners have no authority to provide services absent a medical-necessity determination by a medical professional, "whether or not such services are in the state plan." O.C.G.A. §49-4-169.1(4). The Commissioners also argued that Plaintiffs lack standing because their injuries are not traceable to the Commissioners, who don't control individual doctors' diagnoses. D.Ct.Doct.32-1 at 25-27. Nor would an injunction against the Commissioners redress Plaintiffs' injuries because the injunction could not require third-party physicians not before the Court to prescribe anything as medically necessary. *Id.* On the merits, the Commissioners relied on the same defect: Plaintiffs' Medicaid, ADA, and Rehabilitation

---

[1] Page numbers cited reflect the blue ECF pagination. *See* 11th Cir. R. 28-5.

Act claims fail because Plaintiffs fail to allege ongoing medical necessity for Remedial Services and appropriateness for community-based care. *Id.* at 40-43, 46-53.

### B.     The District Court's Order

On March 25, 2025, the district court denied the Commissioners' motion to dismiss. D.Ct.Doc.47. The district court understood Plaintiffs' claims under the Medicaid Act, ADA, and Rehabilitation Act to be based on the Commissioners' alleged failure to provide Remedial Services. *Id.* at 63, 66, 73, 83.

In its *Ex parte Young* analysis, the district court observed, at a high level of generality, that the Commissioners were "precisely the individuals with the requisite enforcement authority necessary to address Plaintiffs' allegations" just because their agencies touch on Medicaid, mental health, and child welfare. *Id.* at 45. The court did not engage with the Commissioners' argument that they were not the proper defendants under *Ex parte Young* because the provision of Medicaid services turns on doctors' medical-necessity determination, because they do not control medical diagnoses of Plaintiffs' doctors, and because Plaintiffs fail to allege their doctors prescribed the Remedial Services as medically necessary. *See id.* at 43-45. While acknowledging that "a clinician must determine that a service is 'medically necessary' before a child can receive such a service," the court said that because Plaintiffs bring a "systemic case," Plaintiffs did not need to "include each and every specific doctor's referral" and that the complaint sufficiently alleged medical necessity based on the fact that Plaintiffs' doctors previously referred them for some other services that aren't the Remedial Services. *Id.* at 65.

On standing, the district court held that Plaintiffs' injuries were traceable to the Commissioners and redressable by an injunction. *Id.* at 25. The court observed that

"even if it were true that Plaintiffs' doctors were somehow partially responsible for their injuries, that would not defeat traceability." *Id.* at 29. And the court further stated that the "actions of a third party (here, doctors) would [not] preclude an injunction from redressing Plaintiffs' harm." *Id.* at 31.

The district court also concluded that Plaintiffs stated a claim under the Medicaid Act, ADA, and Rehabilitation Act. *Id.* at 61-95. On the Medicaid claims, the court disagreed with the Commissioners' argument that Plaintiffs failed to allege medical necessity. *Id.* at 61-66. On the ADA and Rehabilitation Act claims, the court deemed sufficient Plaintiffs' three theories of discrimination—unjustified institutionalization, risk of institutionalization, and co-occurring disability. *Id.* at 66-95.

The Commissioners appealed, and the district court stayed further proceedings pending this appeal. *See* D.Ct.Doc.48; D.Ct.Doc.51.

## C.    Standard of Review

This Court reviews the district court's denial of a motion to dismiss, including the denial of the motion to dismiss on Eleventh Amendment grounds, de novo. *Summit Med. Assocs., P.C. v. Pryor*, 180 F.3d 1326, 1334 (11th Cir. 1999); *McCullough*, 907 F.3d at 1330.

13

## SUMMARY OF THE ARGUMENT

This Court should reverse and instruct the district court to dismiss the complaint.

**I.** The Commissioners are immune from Plaintiffs' claims. The Eleventh Amendment is an absolute bar to a suit against a State by its own citizens. Below, Plaintiffs asserted that Congress "expressed its intent to abrogate the States' sovereign immunity with respect to claims under Title II of the ADA." D.Ct.Doc.39 at 29 n.6. Plaintiffs further asserted that the *Ex parte Young* exception to sovereign immunity applied. *Id.* at 29-33. Neither argument is persuasive.

**I.A.** Plaintiffs cannot show valid abrogation. Whether Congress validly abrogated Georgia's sovereign immunity in the ADA depends on whether Plaintiffs state a viable claim for relief, the extent to which the alleged misconduct violates the Fourteenth Amendment, and whether abrogation here would be congruent and proportional. First, Plaintiffs fail to state viable ADA claims. Plaintiffs want to enlist a federal court to compel Georgia to create new benefits (i.e., the Remedial Services). The ADA does not require States to create new benefits. Plaintiffs' unjustified-institutionalization theory under *Olmstead* fails because they fail to allege that their treatment professionals determined that community placement is appropriate, because one of the Plaintiffs opposed community placement, and because Plaintiffs improperly seek to impose a standard of care on the States. Plaintiffs' at-risk theory fails because allowing ADA claims to proceed based on a risk of discrimination contradicts the ADA's text and *Olmstead*. And this Court has not recognized such a theory. Plaintiffs' co-occurring-disability theory fails because Plaintiffs merely disagree with the State's judgment regarding diagnostic

14

requirements. Because Plaintiffs fail to state a claim under the ADA, the Commissioners remain immune, and the complaint should be dismissed.

Second, Plaintiffs do not allege violations of the Fourteenth Amendment.

Third, Plaintiffs' claims seeking to force Georgia to create new benefits are not congruent or proportional to the constitutional problems that Congress sought to fix.

**I.B.** The *Ex parte Young* exception requires Plaintiffs to identify the proper defendants who possess the relevant enforcement authority. DHS and DBHDD Commissioners do not oversee Georgia's Medicaid program. Under Georgia law, the DCH Commissioner lacks the authority to provide services under Medicaid if a doctor does not prescribe them as medically necessary. A doctor's recommendation is not an additional avenue to alleging medical necessity; it is a necessary predicate for *establishing* medical necessity under Georgia law. None of the Commissioners can skirt the crucial role played by the State's medical professionals in determining what services are medically necessary or whether community placement is appropriate.

**II.** Plaintiffs lack standing. The standing issue is inextricably intertwined with the sovereign-immunity issue. Plaintiffs' asserted injuries are neither traceable to the Commissioners, who do not control individual doctors' diagnoses, nor redressable by a judgment against the Commissioners, which could not require absent-party doctors to recommend or administer any treatment.

**III.** Plaintiffs fail to state a claim under the Medicaid Act, ADA, and Rehabilitation Act. Because Plaintiffs seek the creation of new Medicaid services, whether those services are prescribed by a doctor as medically necessary is both a sovereign-immunity *and* a merits issue. This Court's decisions have repeatedly affirmed that medical necessity

15

is required for the provision of Medicaid services. Plaintiffs failed to allege that any doctor has prescribed the Remedial Services as medically necessary. In addition, the *Georgia* test already asks whether Plaintiffs stated a claim under the ADA. Because Plaintiffs' ADA claims fail, their virtually identical Rehabilitation Act claims fail too.

## ARGUMENT

### I. Sovereign immunity bars Plaintiffs' Medicaid and ADA claims.

"The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. "To respect the broader concept of immunity, implicit in the Constitution, … [the Supreme Court has] extended a State's protection from suit to suits brought by the State's own citizens." *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 267-68 (1997). The Eleventh Amendment is an "'absolute bar' to a state's being sued by its own citizens." *DeKalb Cnty. Sch. Dist. v. Schrenko*, 109 F.3d 680, 687 (11th Cir. 1997). Georgia's sovereign immunity extends to "state officials when 'the state is the real, substantial party in interest.'" *Pennhurst v. Halderman*, 465 U.S. 89, 101 (1984). "[A] suit against state officials that is in fact a suit against a State is barred regardless of whether it seeks damages or injunctive relief." *Id.* at 101-02. The DCH, DHS, and DBHDD Commissioners each enjoy immunity. *McClendon v. Ga. DCH*, 261 F.3d 1252, 1259 (11th Cir. 2001).

Because the Commissioners enjoy Georgia's sovereign immunity, they cannot be sued under §1983 or the ADA unless some exception applies. Below, Plaintiffs asserted that Congress "expressed its intent to abrogate the States' sovereign immunity with respect to claims under Title II of the ADA." D.Ct.Doc.39 at 29 n.6. Plaintiffs further

asserted that the *Ex parte Young* exception to sovereign immunity applies. *Id.* at 29-33. Plaintiffs are wrong on both.

### A. Congress has not validly abrogated Georgia's sovereign immunity against Plaintiffs' ADA claims.

Congress purported to abrogate the States' sovereign immunity when it passed Title II of the ADA. *See* 42 U.S.C. §12202. But that doesn't mean that Congress's purported abrogation is valid: Congress may abrogate the States' Eleventh Amendment immunity only when it "'act[s] pursuant to a valid grant of constitutional authority.'" *Bd. of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356, 363 (2001). To determine whether Congress validly abrogated the State's immunity through Title II of the ADA, courts must assess "on a claim-by-claim basis" (1) "which aspects of the State's alleged conduct violated Title II"; (2) "to what extent such misconduct also violated the Fourteenth Amendment"; and (3) if the conduct violated Title II but not the Fourteenth Amendment, "whether Congress's purported abrogation of sovereign immunity as to that class of conduct is nevertheless valid." *Georgia*, 546 U.S. at 159. Under this test, Plaintiffs' ADA claims are barred by Georgia's sovereign immunity.

### 1. Plaintiffs fail to state a claim that the Commissioners' alleged conduct violates the ADA.

At the first step, *Georgia* requires this Court to assess "which aspects of the State's alleged conduct violated Title II." *Id.* In other words, this Court "evaluate[s] whether the plaintiff has stated a viable claim under Title II." *Schwarz v. Ga. Composite Med. Bd.*, 2021 WL 4519893, at *4 (11th Cir. Oct. 4). Other courts similarly evaluate "the merits of the underlying [ADA] claim" at this step. *Y.A. by Alzandani v. Hamtramck Pub. Schs.*, —F.4th—, 2025 WL 1463285, at *8 (6th Cir. May 22) (Sutton, C.J.); *Block v. Tex. Bd. of*

*L. Exam'rs*, 952 F.3d 613, 618 (5th Cir. 2020) (starting with whether the plaintiff "has stated a claim under Title II"). Under *Georgia*, "if a plaintiff fails to state a claim under Title II, dismissal is appropriate." *Kohn v. State Bar of Cal.*, 119 F.4th 693, 699 (9th Cir. 2024). This "order of operations also makes sense." *Alzandani*, 2025 WL 1463285, at *8. It allows courts to "avoid constitutional questions," like whether Congress validly abrogated sovereign immunity under the Fourteenth Amendment, by dismissing ADA claims that lack merit at the outset. *Id.*

The ADA states that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. §12132. Plaintiffs raise three theories of ADA discrimination. First, they assert that the Commissioners' alleged failure to provide the Remedial Services resulted in "unnecessary and prolonged institutionalization." D.Ct.Doc.1 ¶223. Second, they contend that the Commissioners' alleged failure to provide the Remedial Services placed them at a "risk of segregation." *Id.* ¶222. Third, they assert that the Commissioners' policies "exclude[e] them from medically necessary services based on the existence of co-occurring disabilities." *Id.* ¶222. To redress these alleged ADA violations, Plaintiffs seek a declaratory judgment that the Commissioners violated the ADA by failing to provide the Remedial Services and an injunction requiring the Commissioners to provide the Remedial Services. *Id.* ¶¶237, 239(a), (d), (f). Plaintiffs' ADA claims fail because the ADA does not require the States to create new entitlement benefits. And each of Plaintiffs' ADA theories are deficient for additional reasons.

18

**a.     The ADA does not require the States to create new entitlement benefits.**

The ADA is an antidiscrimination statute. All that the ADA requires is that the State not discriminate against qualified individuals with a disability and not "exclude[]" them—or "den[y] [them] the benefits of"—"the services, programs, or activities of a public entity" by reason of their disability. 42 U.S.C. §12132. As the Supreme Court made clear in *Olmstead*, the ADA does not command the State to create *new* entitlements, benefits, or services. Because the ADA merely imposes a "nondiscrimination requirement with regard to the services [the States] *in fact provide*," it does not impose on the States "a 'standard of care' for whatever medical service they render" or require them "'to provide a certain level of benefits to individuals with disabilities.'" 527 U.S. at 603 n.14 (majority) (emphasis added). Justice Kennedy similarly rejected the notion that "a State without a program in place is required to create one"—a requirement that would implicate a "political" "judgment … not within the reach of [the ADA]." *Id.* at 612 (Kennedy, J., concurring in the judgment). "Grave constitutional concerns are raised when a federal court is given the authority to review the State's choices in basic matters such as establishing or declining to establish new programs." *Id.* at 612-13. Thus, "a State may not be forced to create a community-treatment program"—or any other new benefit—"where none exists." *Id.* at 613.

In other words, a State cannot have unlawfully discriminated "by denying a benefit that it provides to no one." *Rodriguez*, 197 F.3d at 618. The ADA "'do[es] not guarantee any particular level of medical care for disabled persons, nor assure maintenance of service previously provided.'" *Id.* at 619. *Rodriguez* is especially instructive. There, Medicaid recipients with mental disabilities alleged that New York violated the ADA

by failing to provide "safety-monitoring services" as a part of the "personal-care services" that were included in the Medicaid plan. 197 F.3d at 613. The Second Circuit explained that New York provided safety-monitoring services to "no one." *Id.* at 618. It wasn't as though New York discriminated against individuals with mental disabilities by providing safety-monitoring services to other Medicaid recipients while not providing them to the recipients with mental disabilities. *Id.* The court held that "[u]nder the ADA, it is not [the court's] role to determine what Medicaid benefits New York must provide." *Id.* at 619. Though the plaintiffs "want[ed] New York to provide a new benefit, … *Olmstead* reaffirms that the ADA does not mandate the provision of new benefits." *Id.*

Other courts similarly understand that the ADA does not require the States to create new benefits. The Ninth Circuit thought it was "clear from the language of Title II … that public entities are not required to create new programs and provide heretofore unprovided services to assist disabled persons." *Townsend v. Quasim*, 328 F.3d 511, 518 (9th Cir. 2003). The Seventh Circuit similarly observed that "a 'State is not obligated to create new services'" but that it "'may violate Title II when it refuses to provide an *existing* benefit to a disabled person.'" *Steimel v. Wernert*, 823 F.3d 902, 913 (7th Cir. 2016) (emphasis added). Indeed, the ADA's requirement to "treat patients 'in the most integrated setting appropriate' is not a requirement that [the State] provide patients with specific treatment," *Disability Rts. Cal. v. County of Alameda*, 2021 WL 212900, at *10 (N.D. Cal. Jan. 21); nor is it a requirement to "implement" the services "of the kind the plaintiff proposes," *Disability Rts. Fla. v. Palmer*, 2019 WL 11253085, at *5 (N.D. Fla. Aug. 29).

Here, Plaintiffs seek to compel Georgia to create new benefits: the Remedial Services. D.Ct.Doc.1 ¶3. Plaintiffs allege that these are services the Commissioners currently "do[] not provide" to "any child." *Id.* ¶¶7,223, 225, 231, 233, 239. They also say that Georgia's existing services—IC3, IFI, and GCAL—"are not the Remedial Services" they want. *Id.* ¶¶122, 145. Instead, Plaintiffs want a court to compel the State to fund "heretofore unprovided services," *Townsend*, 328 F.3d at 518, which are Intensive Care Coordination, Intensive In-Home Services, and Mobile Crisis Response Services, D.Ct.Doc.1 ¶1. The fact that Plaintiffs seek to compel Georgia to create new benefits dooms Plaintiffs' ADA claims. *See Olmstead*, 527 U.S. at 603 n.14; *id.* at 612-13 (Kennedy, J., concurring in the judgment); *Rodriguez*, 197 F.3d at 618.

The district court erroneously observed that Plaintiffs' ADA claims are nonetheless viable, characterizing them as merely requesting a reasonable modification of the existing services. D.Ct.Doc.47 at 77-78. This was wrong for at least two reasons.

First, the court conflated the elements of an ADA claim. To state a Title II claim, a plaintiff must allege (1) that he is a "qualified individual"; (2) that he was "excluded," "denied benefits," or "otherwise discriminated against"; (3) by reason of disability. *Bircoll v. Miami-Dade County*, 480 F.3d 1072, 1083 (11th Cir. 2007). Title II defines a "qualified individual" as someone "with a disability who, with or without reasonable modifications … meets the essential eligibility requirements for the receipt of services … provided by a public entity." 42 U.S.C. §12131(2). The Commissioners' argument goes to whether Plaintiffs were "excluded," "denied benefits," or "otherwise discriminated against." A State "cannot have unlawfully discriminated … by denying a benefit that it provides to no one." *Rodriguez*, 197 F.3d at 618. In other words, Plaintiffs were

not "excluded from" or "denied the benefits of services, programs, or activities." 42 U.S.C. §12132. Nor were they "subjected to discrimination." *Id.* This inquiry should be conducted apart from whether a proposed modification is reasonable. *See Rodriguez*, 197 F.3d at 619 n.6 ("Because New York did not discriminate against [the plaintiffs] in violation of the ADA, we need not reach whether separating tasking safety monitoring is a 'reasonable modification[]' required under the ADA by 28 C.F.R. §35.130(b)(7).").

Second, the *creation* of new benefits is not equivalent to a modification of existing services. The district court would "modify" Georgia's existing mental-health regime "in the same sense that the French Revolution modified … the French nobility"—"supplant[ing] them with a new regime entirely." *Biden v. Nebraska*, 600 U.S. 477, 496 (2023) (cleaned up). Indeed, under the ADA, "a State may not be forced to create" new benefits "where none exists." *Olmstead*, 527 U.S. at 613 (Kennedy, J., concurring in the judgment). Contrary to the district court, compelling Georgia to create the Remedial Services would not "build upon existing" services. D.Ct.Doc.47 at 88. Whatever the alleged shortcomings of the existing IFI, IC3 and GCAL services, Plaintiffs do not seek to modify *those services*. Instead, Plaintiffs want Georgia to create three new services—or, at least, fundamentally transform the existing services so as to supplant them with new services. D.Ct.Doc.1 ¶¶3, 145, 239.

Nor would such a "modification"—if it can be called that—be reasonable. Requiring the states to "'create new programs that provide heretofore unprovided services to assist disabled persons'" constitutes a fundamental alteration. *Rose v. Rhorer*, 2014 WL 1881623, at *4 (N.D. Cal. May 9). The *Olmstead* plurality was concerned about fundamental-alteration issues in the context of adjudicating claims of *two* plaintiffs. *Olmstead*,

527 U.S. at 607 (plurality). "Sweeping institution-wide directives … are never 'narrowly tailored' to remedy individual instances of discrimination." *United States v. Mississippi*, 82 F.4th 387, 400 (5th Cir. 2023). Plaintiffs' requested rehaul, D.Ct.Doc.1 ¶¶7, 236-39, is "far more than the reasonable modifications the statute or regulations require[]," *Alexander v. Choate*, 469 U.S. 287, 300 (1985). Because Plaintiffs seek to create new benefits, their ADA claims fail.

### b. Plaintiffs' *Olmstead* claim fails.

Plaintiffs' ADA claim under *Olmstead* fails for independent reasons. In *Olmstead*, the majority interpreted the ADA and the regulatory "integration mandate" to prohibit the "unjustified institutional isolation of persons with disabilities." 527 U.S. at 600 (majority). The *Olmstead* plaintiffs were voluntarily institutionalized. *Id.* at 593. Although each of their treating physicians recommended their release for community placement, the State failed to release them. *Id.* A plurality of the Court concluded that to prevent unjustified institutionalization, a State might be required to provide existing community-based care to an institutionalized patient if three criteria are met: a physician recommends it, the patient doesn't oppose it, and the State can reasonably accommodate the patient in the community. *Id.* at 607 (plurality).

*First*, Plaintiffs fail to allege that they are receiving inpatient care even though "treatment professionals determine[d] that [community] placement is appropriate." *Id. Olmstead* emphasized that "nothing in the ADA or its implementing regulations condones termination of institutional settings for persons unable to handle or benefit from community settings." *Id.* at 601-02 (majority op.). The majority also held that "the State generally may rely on the reasonable assessments of its own professionals in

determining whether an individual 'meets the essential eligibility requirements' for habilitation in a community-based program." *Id.* at 602. Absent these qualifications, the Court emphasized that "it would be inappropriate to remove a patient from the more restrictive setting." *Id.* Justice Kennedy agreed. *Id.* at 610 (Kennedy, J., concurring in the judgment).

Here, Plaintiffs A and B—who say they are receiving inpatient care now, D.Ct.Doc.1 ¶¶31, 43—have not alleged that *any* treating professional has determined that community placement is currently appropriate. *See Mississippi*, 82 F.4th at 394-95 (emphasizing the same deficiency in a systemic challenge by DOJ against Mississippi's mental health care system). The district court pointed to allegations that Plaintiffs' treating teams sometime in the past recommended community placement. D.Ct.Doc.47 at 73-75. Those past assessments are irrelevant. Mental illnesses often carry "unpredictable and varied symptoms." *Mississippi*, 82 F.4th at 396. Past assessments say nothing about what care is appropriate for Plaintiffs today. *See, e.g., Boyd v. Steckel*, 753 F. Supp. 2d 1163, 1174 n.17 (M.D. Ala. 2010) ("the fact that [the plaintiff] lived in the community for eleven years" does not, "in and of itself, establish that community-based services are appropriate for his needs now").

Plaintiffs allege that Plaintiff D's family kept him "at home when not at school." D.Ct.Doc.1 ¶¶63-64. But *Olmstead* concerns "*institutional* isolation," where the State keeps a person in its custody despite a State's own medical professional's recommendation for community placement. 527 U.S. at 600 (emphasis added). And *Olmstead* "controls" where the issue is "the location of services"—between institutional and community-based care—"not whether services will be provided." *Cohon ex rel. Bass v. N.M. Dep't*

*of Health*, 646 F.3d 717, 729 (10th Cir. 2011). "[T]he actions of the family of a person with disabilities [do] not arise out of any service provided by the State, and [do] not implicate the integration mandate." *Disability Advocs., Inc. v. Paterson*, 598 F. Supp. 2d 289, 321 (E.D.N.Y. 2009).

 ***Second***, Plaintiffs fail to allege nonopposition to community placement. Plaintiffs allege that Plaintiff C's treatment team recommended discharging him because he "no longer required" inpatient care. D.Ct.Doc.1 ¶53. Yet C's mother, C.C., opposed C's return home under the proposed "transition plan." *Id.* Despite this opposition, the district court held that "'[t]he relevant question is whether service recipients with disabilities would choose community-based services *if they were actually available and accessible*.'" D.Ct.Doc.47 at 77 (quoting *United States v. Florida*, 682 F. Supp. 3d 1172, 1232 (S.D. Fla. 2023), *appeal pending* No. 23-12331 (11th Cir.)). But the law does not impose a "'standard of care,'" *Olmstead*, 527 U.S. at 603 n.14, and a treating professional's opinion "in determining the appropriate conditions for treatment" is entitled to "the greatest of deference," *id.* at 610 (Kennedy, J., concurring in the judgment). Even if C.C. "protest[ed] about [the] medical judgments," it is not disability "discrimination." *Carpenter-Barker v. Ohio Dep't of Medicaid*, 752 F. App'x 215, 221 (6th Cir. 2018). Besides, Justice Kennedy made it clear that "a State without a program in place" should not be "required to create one." *Olmstead*, 527 U.S. at 612 (Kennedy, J., concurring in the judgment). The district court below ignored these limits in *Olmstead*.

### c. Plaintiffs' at-risk claim fails.

 Plaintiffs' ADA claim under the at-risk theory also fails for independent reasons. Plaintiffs allege that "Defendants' administrative policies, practices, and procedures …

plac[e] them at a serious *risk* of segregation." D.Ct.Doc.1 ¶222 (emphasis added). They also allege the risk of needing inpatient care—that is, that they are "likely" "to experience" the need for inpatient treatment. ¶¶ 33, 44, 54, 64. This theory fails.

At-risk claims are not cognizable under the ADA. This Court has not recognized at-risk claims under the ADA. The Fifth Circuit recently examined the issue and concluded "[n]othing in the text of Title II, its implementing regulations, or *Olmstead* suggests that a *risk of institutionalization*, without actual institutionalization, constitutes actionable discrimination." *Mississippi*, 82 F.4th at 392. The ADA "does not define discrimination in terms of a prospective risk to qualified disabled individuals." *Id.* The terms "excluded," "denied," or "subjected to discrimination," 42 U.S.C. §12132, "refer[] to the actual, not hypothetical administration of public programs," *Mississippi*, 82 F.4th at 392. What this means is plain: "'at risk' claims of ADA discrimination are not within the statutory or regulatory language." *Id.* at 393.

Here, the district court erroneously asserted that at-risk claims are viable under the ADA because "[t]he mandate of the ADA is the 'elimination of discrimination against individuals with disabilities.'" D.Ct.Doc.47 at 81 (quoting 42 U.S.C. §12101(b)(1)). But no law "'pursues its purposes at all costs,'" *Regions Bank v. Legal Outsource PA*, 936 F.3d 1184, 1196 (11th Cir. 2019). "'[I]t frustrates rather than effectuates legislative intent simplistically to assume *whatever* furthers the statute's primary objective must be the law.'" *Id.* The limitations and absent provisions "'are no less a reflection of the genuine 'purpose' of the statute than the operative provisions,'" and courts should not "'alter'" such a feature. *Id.* Ultimately, the ADA respects the States' resource constraints, doesn't require creation of new benefits, doesn't impose a standard of care, and

requires individualized assessment of whether community-based treatment is appropriate. *Olmstead*, 527 U.S. at 601-03 & n.14 (majority op.); *id.* at 613-15 (Kennedy, J., concurring in the judgment). The limited reach of the ADA's discrimination provision reflects these concerns. Recognizing at-risk claims ignores these limits and stretches the ADA far beyond Congress's wishes. And "this 'at risk' theory 'at bottom, is simply a request for more … funding, something the ADA does not permit.'" *Mississippi*, 82 F.4th at 398; *accord Waskul v. Washtenaw Cnty. Cmty. Mental Health*, 979 F.3d 426, 470 (6th Cir. 2020) (Readler, J., dissenting in part).

The district court further thought that *Olmstead* somehow supported at-risk claims. D.Ct.Doc.47 at 78-83. The court latched onto the following discussion in *Olmstead*: "'In order to receive needed medical services, persons with mental disabilities must, because of those disabilities, relinquish participation in community life they could enjoy given reasonable accommodations, while persons without mental disabilities can receive such medical services they need without similar sacrifice.'" *Id.* at 81 (quoting *Olmstead*, 527 U.S. at 601). But despite this observation, *Olmstead* never fashioned a claim based on the risk of institutionalization. Ultimately, *Olmstead* recognized a claim based on "actual 'unjustified institutionalization,' not on hypothetical future events." *Mississippi*, 82 F.4th at 394. *Olmstead*'s three-part test based on "patient-specific" situations is "incompatible" with the at-risk theory. *Id.*

### d.    Plaintiffs' co-occurring discrimination claim fails.

Plaintiffs argue that they stated a claim regarding Defendants' alleged discrimination based on "co-occurring disabilities." Opp. 47. Although the complaint is vague, D.Ct.Doc.1 ¶¶222, 230, Plaintiffs argued below that "Defendants' service eligibility

criteria" for the existing service (IFI and IC3) discriminate against them, D.Ct.Doc.39 at 61. According to Plaintiffs, the Commissioners use "[o]verly restrictive diagnostic[s]" for IC3 and IFI. D.Ct.Doc.1 ¶¶159, 167. This theory fails.

To start, A, B, and D all alleged that they *have* received or were referred to IFI and/or IC3 despite having co-occurring conditions. *Id.* ¶¶25, 28, 37, 40, 57, 62. Only C alleged that he was denied IFI (but not IC3) "due to his concurrent Autism diagnosis." *Id.* ¶50. But C failed to allege that changing the eligibility criteria for IFI would lead to C.C.'s changing her mind and agreeing to C's discharge. *See id.* ¶53 (alleging C.C. wants "Remedial Service," not IFI, as a condition for his discharge). Furthermore, as Plaintiffs concede, having Autism does not even preclude obtaining IFI. IFI can still be provided if "'there is clearly documented evidence of an acute psychiatric … disorder episode overlaying the diagnosis.'" *Id.* ¶167 (quoting DBHDD, Provider Manual for Community Behavioral Providers Health Providers, Fiscal Year 2024, Quarter 3, at 89 (Dec. 1, 2023)). Plaintiffs' theory boils down to the allegation that *these* diagnostic requirements are "[o]verly restrictive" for IFI. D.Ct.Doc.1 ¶159. And the district court agreed, observing that Plaintiffs are being "institutionalized" because of these diagnostic criteria. D.Ct.Doc.47 at 84. But, again, the ADA does not allow Plaintiffs or the district court to impose their preferred standard of care on Georgia. *Olmstead*, 527 U.S. at 603 n.14 (majority); *Palmer*, 2019 WL 11253085, at *6.

### 2.    Plaintiffs' claims are not congruent and proportional.

Because Plaintiffs fail at the first step of the *Georgia* test, this Court does not need to reach the second and third steps. And because that means that Plaintiffs fail to state a claim under the ADA, this Court can dismiss Plaintiffs' ADA claims outright. *See, e.g.,*

*Schwarz*, 2021 WL 4519893, at *4; *see also Alzandani*, 2025 WL 1463285, at *8 ("merits and jurisdiction 'come intertwined'" under the *Georgia* test).

Even if this Court were to reach the second and third steps of the *Georgia* test, Plaintiffs still cannot show valid abrogation. At the second step, the Court must determine "to what extent [the alleged] misconduct also violated the Fourteenth Amendment." 546 U.S. at 159. Plaintiffs do not allege any Fourteenth Amendment violations. Because Plaintiffs do not allege a Fourteenth Amendment violation, at the third step, abrogation of immunity must "nevertheless [be] valid" (i.e., congruent and proportional). *Schwarz*, 2021 WL 4519893, at *3. Courts must examine the right at issue, the existence of a history of discrimination, and whether Title II is an appropriate response. *Nat'l Ass'n of the Deaf v. Florida*, 980 F.3d 763, 771 (11th Cir. 2020). But "absent the need to vindicate a fundamental right or protect a suspect class, Congress may not abrogate state sovereign immunity." *Guttman v. Khalsa*, 669 F.3d 1101, 1122 (10th Cir. 2012); *see Tennessee v. Lane*, 541 U.S. 509, 523, 533-34 (2004).

Here, Plaintiffs identify no fundamental right or suspect class. Plaintiffs merely assert a right to new programs or more funding. Congress cannot abrogate the states' immunity to allow private suits to compel states to provide new programs and more funding. *See Olmstead*, 527 U.S. at 603 n.14 (majority); *id.* at 612-13 (Kennedy, J., concurring in the judgment). Such a remedy "substantively redefine[s] the States' legal obligations" and cannot be justified by the ADA's "legislative record" which focused on removing discrimination. *Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 88 (2000); *see* 42 U.S.C. §12101.

29

**B.    The *Ex parte Young* exception does not apply to Medicaid and ADA claims.**

*Ex parte Young* created "a 'fiction'" that "when a federal court commands a state official to do nothing more than refrain from violating federal law, he is not the State." *Va. Off. for Prot. & Advoc. v. Stewart*, 563 U.S. 247, 254-55 (2011) (cleaned up). Under *Ex parte Young*, State officials are "not immune from suits that seek prospective declaratory or injunctive relief against ongoing violations of federal law." *Muscogee (Creek) Nation v. Rollins*, 119 F.4th 881, 887 (11th Cir. 2024). This exception, however, doesn't apply if the State official lacks "any enforcement authority" to enforce allegedly invalid "state laws" or actions. *WWH v. Jackson*, 595 U.S. 30, 43-44 (2021). This is because "[a]lthough a court can enjoin state officials from enforcing statutes, such an injunction must be directed to those who have the authority to enforce those statutes." *Mi Familia Vota v. Abbott*, 977 F.3d 461, 468 (5th Cir. 2020). Thus, "unless the state officer has some responsibility to enforce the statute or provision at issue, the 'fiction' of *Ex parte Young* cannot operate." *Summit*, 180 F.3d at 1341. "Where the enforcement … is the responsibility of parties other than the [named state official]," that officials' general authority over the matter is "insufficient to confer jurisdiction." *Women's Emergency Network v. Bush*, 323 F.3d 937, 949-50 (11th Cir. 2003); *accord Families A Through V v. DeSantis*, 658 F. Supp. 3d 1063, 1067 (N.D. Fla. 2023). This is a "claim-by-claim and defendant-by-defendant analysis." *Muscogee*, 119 F.4th at 888. "Courts cannot know whether *Ex parte Young* permits a claim without considering against whom relief is sought." *Id.*

**Medicaid claims (Counts I and II).** Plaintiffs' Medicaid claims (brought under §1983) fail because DCH Commissioner Carlson lacks the authority to provide EPSDT

services, including Plaintiffs' proposed Remedial Services, unless they are "recommended as medically necessary by a physician," O.C.G.A. §49-4-169.1(4)-(5), and Plaintiffs fail to allege that any physician recommended the Remedial Services as medically necessary.

Under the Medicaid Act, Georgia has discretion "to define medical necessity in a way tailored to the requirements of its own Medicaid program." *Moore*, 637 F.3d at 1258. Georgia defines "medically necessary services" as services that are, among other things, prescribed by "a physician or other licensed practitioner." O.C.G.A. §49-4-169.1(4). Likewise, "services provided pursuant to the EPSDT Program" are those "which are recommended as medically necessary by a physician." *Id.* §49-4-169.1(5). If a physician does not recommend a treatment as medically necessary, Georgia has no obligation—or authority—to provide that service under Medicaid. *Moore*, 637 F.3d at 1255-57. Commissioner Carlson has some authority to review care management organizations' decisions about coverage. *See* O.C.G.A. §49-4-153. And DCH plays a role in granting prior approval for therapy services and in conducting utilization reviews. *See id.* §49-4-169.3(c), (e), (f). But they do not provide the initial, necessary determination, by a licensed practitioner, that a service is medically necessary. O.C.G.A. §49-4-169.1(4)-(5). Moreover, even prior authorizations and utilization review turn on medical-necessity determinations, which are initially made by the doctors, not the Commissioner. *See* O.C.G.A. §49-4-169.3(c) ("Notwithstanding any other provision of law, the department, its utilization review vendors, or its care management organizations shall grant prior approval for requests for therapy services when … the services prescribed

31

are medically necessary."); *id.* §49-4-169.3(e) ("Any such restrictions shall be waived … if the prescribed services are medically necessary.").

Here, Plaintiffs don't allege that they are not receiving the Remedial Services because of Georgia's prior-approval or utilization-review processes in which Commissioner Carlson may play a role. Instead, they allege that they are not receiving the Remedial Services because they are not included in Georgia's Medicaid plan. D.Ct.Doc.1 ¶145. But under Georgia law, regardless of "whether or not such services are in the state plan," Commissioner Carlson lacks the authority to provide the services unless they are "medically necessary"—that is, "prescribed by a physician or other licensed practitioner." O.C.G.A. §49-4-169.1(4). Because Commissioner Carlson does not make this threshold medical-necessity determination, he is not a proper defendant. *See Summit*, 180 F.3d at 1342 (dismissing claims against the Governor, the Attorney General, and the District Attorney because "only a *husband* or a *maternal grandparent* may enforce the civil provision of the partial-birth abortion statute").

The district court erroneously refused to engage with this argument, failing to analyze Georgia's statutory scheme for medical-necessity determination as part of the *Ex parte Young* analysis. *See* D.Ct.Doc.47 at 43-45. Instead, the court incorrectly concluded the *Ex parte Young* exception applies because DCH is "the single state agency tasked with the responsibility for administering Georgia's Medicaid program" and Commissioner Carlson oversees DCH's operations. *Id.* at 44. But *Ex parte Young* requires a "more detailed analysis." *Mi Familia*, 977 F.3d at 468. A simple wave at a state officer's duties does not suffice. *See Osterback v. Scott*, 782 F. App'x 856, 859 (11th Cir. 2019) ("the Governor's constitutional and statutory authority to enforce the law and oversee

the executive branch does not make him a proper defendant under *Ex parte Young*"). For instance, in *Mi Familia Vota*, the plaintiffs challenged the Texas Governor's executive order exempting the mask requirements for voters and poll workers. 977 F.3d at 467. Although the Governor had the power to "issue, amend or rescind" the executive order, he had no power under state law to enforce the executive order. *Id.* Nor was Texas's Secretary of State a proper defendant for a claim challenging Texas's "prohibition of the use of paper ballots" because the Secretary "is not responsible for printing or distributing ballots." *Id.* at 468. "That responsibility falls on local officials." *Id.* For that reason, "[d]irecting the Secretary not to enforce the electronic-voting-devices-only provision … would not afford the Plaintiffs the relief that they seek." *Id.*

The same is true here: an injunction or declaration against Commissioner Carlson would not, and cannot, require any physician to say the Remedial Services are medically necessary. *See id.*; *cf. Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1254 (11th Cir. 2020) (injunction and declaration would not bind other necessary actors). Plaintiffs "have identified nothing that might allow a federal court to parlay [Commissioner Carlon's] authority … into an injunction against any and all unnamed" doctors, *WWH*, 595 U.S. at 44, who "'initially determine[]'" what Medicaid services are "'medically necessary,'" *M.H.*, 111 F.4th at 1308.

The district court also erroneously concluded "each Plaintiff has in fact alleged that treatment professionals or clinicians referred them to some form of Remedial Services or the closest version of a Remedial Service." D.Ct.Doc.47 at 64. But this is wrong. The most that Plaintiffs allege is that their treatment professional referred them to Georgia's existing services like IFI or IC3. D.Ct.Doc.1 ¶¶28, 40, 50, 52, 62. And the

fact that the treatment professionals referred them for IFI or IC3 as medically necessary at one point does not mean that those professionals think that the distinct Remedial Services are medically necessary—indeed, Plaintiffs whole argument is that one is different from the other.

The district court also stated that that "in a systemic case," Plaintiffs do not need to allege "each and every specific doctor's referral" and can simply assert that Commissioner "did not make available the required Remedial Services to most children who needed them." D.Ct.Doc.47 at 65. But this statement mischaracterizes Plaintiffs' failure to allege that *any* clinician recommended, prescribed, or found medically necessary *any* of the Remedial Services to *any* individual Plaintiff or similarly situated child. This statement also ignores what the court conceded to be the law—namely, that under Georgia law and the Medicaid Act, "a clinician must determine that a service is 'medically necessary' before a child can receive such a service." *Id.* at 64 (citing *Moore*, 637 F.3d at 1233; O.C.G.A. §49-4-169.1(4)). Nor can the court assume an entire element of a claim. "'[T]he *Twombly-Iqbal* plausibility standard applies equally to' a complaint 'involving defendants who are able to assert[] immunity as a defense.'" *McCullough*, 907 F.3d at 1330. More broadly, *Ex parte Young*'s requirement that Plaintiffs identify the proper defendant is not excused because a case involves "systemic" allegations. *Contra* D.Ct.Doc.47 at 64-65; *see City of South Miami v. Governor*, 65 F.4th 631, 644 (11th Cir. 2023) (explaining that the Court examined whether the governor had authority to commence and direct criminal prosecutions in *Luckey v. Harris*, 860 F.2d 1012 (11th Cir. 1988), where the plaintiffs alleged "'systemic deficiencies'"). For these reasons, Commissioner Carlson is not a proper defendant.

***ADA claims (Count III).*** As a threshold matter, this Court does not need to reach the *Ex parte Young* issue because this Court should dismiss Plaintiffs' ADA claims for failure to state a claim under the *Georgia* test. *See* supra Part I(a)(1); *see also Babcock v. Michigan*, 812 F.3d 531, 541 (2016) (affirming the denial of leave to add "'state agents'" under *Ex parte Young* as futile because the plaintiff failed to state a claim).

Even if the Court were to reach the *Ex parte Young* issue, Plaintiffs' ADA claims against all Commissioners fail. To start, Plaintiffs seek to use the ADA to compel Georgia to create new Remedial Services under the Medicaid program. D.Ct.Doc.1 ¶¶182-83, 188, 194-95. As explained above, DCH Commissioner Carlson lacks the authority to provide Medicaid services that are not medically necessary. *See* supra Part I(b). DHS and DBHDD do not oversee Georgia's Medicaid program. *See* O.C.G.A. §49-4-142(a) (DCH is the single Medicaid agency). Neither DHS Commissioner Broce nor DBHDD Commissioner Tanner has the authority to direct the inclusion of the Remedial Services in Georgia's Medicaid plan.

Nor do the Commissioners have the authority to determine whether the individual Plaintiffs would benefit from community placement or release them from inpatient care. *See Olmstead*, 527 U.S. at 603-03. As for DHS Commissioner Broce, Plaintiffs C and D allege that they are not in DFCS's legal custody. D.Ct.Doc.1 ¶¶53, 63. Commissioner Broce's authority to obtain medical services is limited to "those children subject to the supervision and control of the department." O.C.G.A. §49-5-8(a)(9). As for Plaintiffs A and B, who allege they are in DFCS's legal custody, D.Ct.Doc.1 ¶¶31, 43, Commissioner Broce's authority is limited to "providing all medical services … as may be considered appropriate and necessary by competent medical authority." O.C.G.A.

§49-5-8(a)(9). Plaintiffs don't allege that the Remedial Services or community placement have been "considered appropriate and necessary by competent medical authority." The district court merely stated that because Commissioner Broce is "responsible for ensuring that the children in DFCS custody … receive care and services in compliance with the ADA," she was the proper defendant. D.Ct.Doc.47 at 44. But the court did so without engaging with the statutory language limiting Commissioner Broce's authority to providing services that are "considered appropriate and necessary by competent medical authority." O.C.G.A. §49-5-8(a)(9). Commissioner Broce is not a proper defendant.

As for DBHDD, the district court said that Commissioner Tanner is a proper defendant because DBHDD "administers and supervises state programs for mental health, developmental disabilities, and addictive diseases." D.Ct.Doc.47 at 44. But DBHDD does not oversee Georgia's Medicaid program or children under the State's legal custody. And none of the individual Plaintiffs are alleged to be among the population for whom DBHDD funds or oversees non-emergency community-based services. DBHDD primarily provides oversight and funding of non-emergency services for a small minority of Georgia children who are uninsured, underinsured, or enrolled in Aged, Blind, and Disabled Medicaid. *See* DBHDD, *Requirements to Access DBHDD Funds for Child & Adolescent Behavioral Health Services*, 01-106 (Jan. 1., 2011), gadbhdd.policystat.com/policy/9027197/latest. Plaintiffs don't allege that they are enrolled in this type of Medicaid versus other types funded and overseen by other agencies. Nor can DBHDD mandate that emergency and non-emergency services be provided through Georgia's other Medicaid programs. And DBHDD does not control Plaintiffs'

physicians' medical diagnoses. *Cf.* 42 C.F.R. §§441.152, 441.153. So, DBHDD lacks the relevant "enforcement authority" for ADA purposes (i.e., determining whether Plaintiffs should receive inpatient care or community-based care). *WWH*, 595 U.S. at 43.

## II.    Plaintiffs lack standing.

Plaintiffs cannot show traceability and redressability for the same reason sovereign immunity bars their claims. "When traceability and redressability are at stake the key questions are who caused the injury and how it can be remedied." *South Miami*, 65 F.4th at 640. Here, a judgment against the Commissioners would not remedy anything, because they are not medical professionals initially responsible for determining the medical necessity of these services.

### A.    Plaintiffs' injuries are not traceable to the Commissioners.

The Commissioners did not cause Plaintiffs' alleged injuries. Plaintiffs must "demonstrate *factual* causation" for each claim against each defendant. *Walters v. Fast AC, LLC*, 60 F.4th 642, 650 (11th Cir. 2023). Here, Plaintiffs' alleged injuries are caused by and traceable to "the independent action of some third party not before the court"— namely, any and all doctors who declined to prescribe these services as medically necessary. *Swann v. Sec'y*, 668 F.3d 1285, 1288 (11th Cir. 2012).

Plaintiffs' alleged causal chain looks like this: The State provides funding and oversight for specific Medicaid programs; Plaintiffs are enrolled in Medicaid and require treatment for their mental health conditions (D.Ct.Doc.1 ¶¶24, 36, 47, 57); that treatment, in Plaintiffs' own opinion, must include the Remedial Services, like "Intensive Care Coordination" (*Id.* ¶146), but not anything under Georgia's Medicaid plan, like "Intensive *Customized* Care Coordination" (*Id.* ¶145); Plaintiffs have not received the

Remedial Services (*Id.* ¶¶33, 44, 54, 64); therefore, Plaintiffs assert that their difficulty in securing those services is traceable to the Commissioners.

But there is a missing link—no physician has prescribed or recommended the Remedial Services as medically necessary. Before the Commissioners are authorized under Georgia law to provide a treatment to Medicaid-eligible children, that treatment must be "recommended as medically necessary by a physician." O.C.G.A. §49-4-169.1(4)-(5); *accord Moore*, 637 F.3d at 1232-33. Given their circumscribed "enforcement power," the Commissioners could not have "partially caused, or threatened to cause," Plaintiffs' asserted injury. *South Miami*, 65 F.4th at 644. That severs the causal chain of traceability.

When deciding that Plaintiffs sufficiently alleged causation, the district court got things backwards. Seeming to rely on the "concept of multiple sufficient causes," *Walters*, 60 F.4th at 651, the court supposed that if "doctors were somehow partially responsible for [Plaintiffs'] injuries, that would not defeat traceability," D.Ct.Doc.47 at 29. The rule that "standing is not defeated merely because the alleged injury can be fairly traced to the actions of both parties and non-parties" is inapposite here. *Loggerhead Turtle v. Cnty. Council of Volusia Cnty.*, 148 F.3d 1231, 1247 (11th Cir. 1998). For it to apply, "there must have been multiple *causes* of the injury." *Walters*, 60 F.4th at 651 (emphasis added). As alleged, there is only one: the absence of a professional determination of medical necessity. This is akin to the recipient of a telemarketing call crying foul against the caller without having first requested to be put on the do-not-call list. *See Cordoba v. DIRECTV*, 942 F.3d 1259, 1271-72 (11th Cir. 2019) ("no remotely plausible causal chain"). Or an inmate complaining of not having received an absentee ballot

without having first notified the state of his jail address. *See Swann*, 668 F.3d at 1287-89. Or several other situations when a plaintiff cannot trace his harm to the defendant's conduct because he "would have been injured in precisely the same way even if the state officials had not engaged in the conduct that he claimed was unlawful." *Cordoba*, 942 F.3d at 1272.[2] *See, e.g., M.S. v. Premera Blue Cross*, 118 F.4th 1248, 1262-63 (10th Cir. 2024) (no traceability where healthcare benefits would have been denied as medically unnecessary despite defendant's conduct). In short, the condition necessary to trigger the Commissioners' legal duty toward Plaintiffs has not yet arisen, so Plaintiffs cannot connect the causal chain between their alleged injury and the Commissioners' conduct.

Ultimately, the district court's version of this "lawsuit is based on an imaginary set of facts," *Swann*, 668 F.3d at 1289—imaginary treatment recommendations by doctors and imaginary treatment refusals by the Commissioners. Citing seven paragraphs from the complaint, the court declared that Plaintiffs "were denied medically home and community-based services that medical professionals recommended." D.Ct.Doc.47 at 28. But upon even cursory inspection, Plaintiffs' allegations say *nothing* about any physician who actually treated any Plaintiff. Instead, they merely repeat Plaintiffs' own conclusory opinion that the Remedial Services are "necessary." *See* D.Ct.Doc.1 ¶¶2, 13, 163, 188, 216, 222 (merely asserting that these services are "medically necessary"); ¶12 ("necessary mental health services"). As alleged, the Commissioners never denied any treatment prescribed as medically necessary by a medical professional. If Plaintiffs have

---

[2] *See also Lewis v. Governor of Ala.*, 944 F.3d 1287, 1301-02 (11th Cir. 2019) (en banc); *Jacobson*, 974 F.3d at 1253-54; *Support Working Animals v. Governor of Fla.*, 8 F.4th 1198, 1205 (11th Cir. 2021); *South Miami*, 65 F.4th at 644.

not received the Remedial Services, it is not because of any action or inaction of the Commissioners. "Nothing wrongful can arise from those facts." *Swann*, 668 F.3d at 1289.

### B.    Plaintiffs' injuries are not redressable by an order against the Commissioners.

"[F]or many of the same reasons," Plaintiffs' alleged injuries would not be "redressed by a favorable judgment." *Support Working Animals v. Governor of Fla.*, 8 F.4th 1198, 1205 (11th Cir. 2021). Plaintiffs request a declaration that the Commissioners have violated the Medicaid Act, ADA, and Rehabilitation Act "by failing to provide the Remedial Services," D.Ct.Doc.1 ¶¶236-37, and a permanent injunction requiring the Commissioners to take a host of affirmative steps toward administering the Remedial Services, *id.* ¶239. A judgment against the Commissioners "wouldn't significantly increase the likelihood of redressing" Plaintiffs' alleged injuries because the Commissioners have no "enforcement authority" to provide medically unnecessary care, and the judgment would bind only the Commissioners, "not other parties not before this Court," such as third-party physicians. *Support Working Animals*, 8 F.4th at 1205. In the end, Plaintiffs "will allegedly be harmed in the same manner whether" the Commissioners "are enjoined or not." *South Miami*, 65 F.4th at 645.

Under Georgia law, unless a doctor first prescribes the Remedial Services as medically necessary, the Commissioners have "no enforcement authority" to provide that care. *See Support Working Animals*, 8 F.4th at 1205; O.C.G.A. §49-4-169.1(4). Plaintiffs take no issue with Georgia's definition of "medically necessary services" as including all treatments "prescribed by a physician," "whether or not such services are in the

state plan." O.C.G.A. §49-4-169.1(4). No state-constructed barriers are stopping any physician from prescribing the Remedial Services. Still, according to Plaintiffs' allegations, *their own doctors* have not. So even if the Commissioners were ordered to include the Remedial Services in the State's Medicaid plan, Plaintiffs would not receive them. Thus, Plaintiffs' "grievance lies with absent third part[y]" doctors, not with the Commissioners, who have no enforcement authority to fund unnecessary medical care. *South Miami*, 65 F.4th at 640; *accord Lewis v. Governor of Ala.*, 944 F.3d 1287, 1301-02 (11th Cir. 2019) (en banc) ("Plaintiffs' immediate gripe is with" nonparty employers). Because these medical professionals, "who aren't parties to the litigation," are "free to engage" in the conduct allegedly injuring Plaintiffs, redressability is lacking. *Support Working Animals*, 8 F.4th at 1205.

To find Plaintiffs' alleged injuries redressable, the district court put the cart before the horse. The court deemed sufficient Plaintiffs' allegation that "*if* Remedial Services were provided," and "*if* Defendants were to … implement policies to ensure that class members receive Remedial Services," then Plaintiffs alleged injuries would likely be redressed. D.Ct.Doc.47 at 30 (emphasis added). But that ignores the Commissioners' limited authority in this context to provide *only* medically necessary care, as defined by Georgia law to encompass *only* physician-prescribed treatments and nothing more. *See* O.C.G.A. §49-4-169.1(4)-(5); *Moore*, 637 F.3d at 1233, 1255. The district court's redressability determination rests on the assumption that the Commissioners have the plenary authority to provide the Remedial Services absent a physician's recommendation. The Commissioners do not.

41

After conflating Plaintiffs' conclusory statements about their alleged need for the Remedial Services with professional determinations of medical necessity, the district court shrugged off as "entirely speculative" the idea that Plaintiffs' doctors would "preclude an injunction from redressing Plaintiffs' harm." D.Ct.Doc.47 at 31. If the court was suggesting that a judgment against the Commissioners might have a "persuasive effect" on non-party doctors, that notion is entirely foreclosed. "Any persuasive effect a judicial order might have upon … absent nonparties who are not under the [defendant's] control[] cannot suffice to establish redressability." *Jacobson*, 974 F.3d at 1254; *accord Lewis*, 944 F.3d at 1305. "Redressability requires that the court be able to afford relief *through the exercise of its power*, not through the persuasive or even awe-inspiring effect of the opinion *explaining* the exercise of its power." *Support Working Animals*, 8 F.4th at 1205 (quoting *Franklin v. Massachusetts*, 505 U.S. 788, 825 (1992) (Scalia, J., concurring)). As alleged, Plaintiffs have not yet received a professional determination that the Remedial Services are medically necessary to treat their mental health conditions, and a judgment binding the Commissioners would do nothing to change that.

In sum, Plaintiffs lack standing for failing to sufficiently allege medical necessity.

### C.    GAO and the proposed class lack standing.

Because the individual Plaintiffs, who act as proposed class representatives, lack standing, the proposed class necessarily lacks standing. *Williams v. Reckitt Benckiser LLC*, 65 F.4th 1243, 1253 (11th Cir. 2023). GAO, the organizational Plaintiff, also lacks associational standing for failing to identify a single member with standing. *See Summers v. Earth Island Inst.*, 555 U.S. 488, 498-99 (2009).

### III. Plaintiffs fail to state a claim.

Plaintiffs' Medicaid Act, ADA, and Rehabilitation Act claims fail on the merits for the same reason their claims are barred by sovereign immunity: They do not allege medical necessity, and medical necessity is an element of each claim.

#### A. Plaintiffs' Medicaid claims fail because they fail to allege that the Remedial Services are medically necessary.

Plaintiffs assert that Georgia's plan violates Medicaid's EPSDT provision by not including the Remedial Services (Count I) and by not providing the Remedial Services with "reasonable promptness" (Count II). To state claims for relief, Plaintiffs had to allege that DCH withheld medically necessary care—defined by Georgia law as care recommended by a physician. Plaintiffs did not.

All states participating in Medicaid must provide EPSDT services for eligible persons under the age of 21. 42 U.S.C. §1396a(a)(10)(a) (requiring states to "mak[e] medical assistance available"); *id.* §1396d(a)(4)(B) (defining "medical assistance" to include EPSDT services). The EPSDT program is codified at 42 U.S.C. §1396d(r) and includes "other necessary healthcare, diagnostic services, treatment, and other measures described in subsection (a) …, whether or not such services are covered under the State plan." §1396d(r)(1), (5). Subsection (a), in turn, lists 32 categories of mandatory EPSDT services. §1396d(a)(1)-(32). These include "remedial services (provided in a facility, a home, or other setting) recommended by a physician or other licensed practitioner." §1396d(a)(13)(C).

The Medicaid Act's application here is simple, is straightforward, and turns on one issue: whether Plaintiffs alleged that the Remedial Services they demand are medically necessary. This Court need look only to its prior decision in *Moore v. Reese*, 637 F.3d

1220. The district court all but ignored *Moore* and thus missed the key takeaway: When making medically necessary EPSDT services available to Medicaid-eligible individuals, Georgia gets to "define medical necessity." 637 F.3d at 1248.

*Moore* concerned a dispute over Georgia DCH's reduction of the plaintiff's "private duty nursing care from 94 to 84 hours per week." *Id.* at 1223. The Court emphasized up front that "even if a category of medical services or treatments is mandatory under the Medicaid Act, participating states must provide those medical services … only if they are 'medically necessary.'" *Id.* at 1233; *accord. id.* at 1259. On that point, the parties and district court appear to agree. *See* D.Ct.Doc.39 at 46 ("Plaintiffs need to allege facts showing that they … have been found to need the Remedial Services."); D.Ct.Doc.47 at 62 (Plaintiffs "must allege that the services they seek … are necessary to correct or ameliorate their conditions."). And this rule makes sense, because "it is hardly inconsistent with the objectives of the Act for a State to refuse to fund *unnecessary*—though perhaps desirable—medical services." *Beal v. Doe*, 432 U.S. 438, 441, 444-45 (1977) (upholding Pennsylvania's limits on Medicaid funding for abortions to only those "certified by physicians as medically necessary").

*Moore* then identified *who* sets the standard for medical necessity: Georgia gets to "define medical necessity in a way tailored to the requirements of its own Medicaid program." 637 F.3d at 1248; *see also id.* at 1255. In other words, Georgia can "'place appropriate limits' on [EPSDT] services 'based on … medical necessity.'" *Moore*, 637 F.3d at 1259 (quoting 42 C.F.R. §440.230(d)). Georgia has done so. Georgia defines "medically necessary services" as those "prescribed by a physician or other licensed practitioner," "whether or not such services are in the state plan." O.C.G.A. §49-4-

44

169.1(4). Likewise, therapy "services provided pursuant to the EPSDT Program" are those "which are recommended as medically necessary by a physician." §49-4-169.1(5). Plaintiffs do not dispute that Georgia's definition controls.

Plaintiffs never alleged that any provider prescribed the Remedial Services they demand as medically necessary. Thus, there can be no "reasonable inference" drawn that DCH "is liable for" withholding what amounts to medically unnecessary care. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The most Plaintiffs have alleged is that clinicians have recommended existing services (D.Ct.Doc.1 ¶¶27-28, 39, 40-42, 49-50, 61-62) and placement in or discharge from inpatient care (*id.* ¶¶27, 30, 49, 52-53, 62).[3] Citing these same allegations, the district court insisted that Plaintiffs had actually "alleged that treatment professionals or clinicians referred them to *some form* of Remedial Services or the *closest version* of a Remedial Service that Georgia offered." D.Ct.Doc.47 at 64 (emphasis added). But Plaintiffs themselves insist that the state's existing specialty services "are not the Remedial Services." D.Ct.Doc.1 ¶¶145, 158, 163. That's the thesis of the whole suit—Georgia provides one set of services, and Plaintiffs demand another. Past recommendations for existing services do not demonstrate that doctors have recommended the Remedial Services as medically necessary. Based on the four corners of the complaint, the only explanation for why DCH does not fund the Remedial Services is that the Remedial Services are medically unnecessary in light of Georgia's existing services. DCH has no obligation to provide unnecessary care.

---

[3] Allegations that an individual "needs, but is not receiving, the Remedial Services," D.Ct.Doc.1 ¶¶33, 44, 54, 64, are just "'formulaic recitation[s] of the elements'" of a Medicaid claim, *Iqbal*, 556 U.S. at 681. This Court must "discard" those conclusory assertions. *McCullough*, 907 F.3d at 1334.

45

Avoiding this inescapable inference, the district court declared that "a complaint clearly alleging that services are medically necessary need not include each and every specific doctor's referral." D.Ct.Doc.47 at 65. Maybe not, but this simply begs the question: have Plaintiffs sufficiently alleged medical necessity as Georgia defines that term? To "clearly alleg[e] that services are medically necessary," Plaintiffs must allege that those services are prescribed by a treating physician. Here, Plaintiffs have not alleged even a single "doctor's referral." In other words, a doctor's recommendation is not an additional requirement to alleging medical necessity, it is a necessary predicate for *establishing* medical necessity under Georgia law. Reciting conclusory statements of "necessity" and recommendations for existing services "stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Iqbal*, 556 U.S. at 678. Plaintiffs' "reasonably prompt" claim (Count II) necessarily fails because they have no right to the reasonably prompt provision of *unnecessary* medical care. 42 U.S.C. §1396a(a)(10)(A). Plaintiffs fail to state claims under the Medicaid Act.

### B.    Plaintiffs' ADA and Rehabilitation Act claims fail.

Plaintiffs fail to state claims under the ADA for the reasons above. *See* supra Part I(a)(1). For the same reasons, Plaintiffs' virtually identical Rehabilitation Act claims fail. ADA and Rehabilitation Act claims are generally "analyzed under the same standards," except the Rehabilitation Act's "solely by reason of" language imposes a "higher" "burden of establishing causation." *Wade v. Fla. Dep't of Juv. Just.*, 745 F. App'x 894, 896 (11th Cir. 2018). Because Plaintiffs fail to state a claim under the ADA, they also fail to state a claim under the Rehabilitation Act.

46

## CONCLUSION

For the foregoing reasons, this Court should reverse, remand, and instruct the district court to dismiss the complaint.

Dated: June 11, 2025

/s/ Bryan K. Webb
Christopher M. Carr
  *Attorney General*
Stephen J. Petrany
  *Solicitor General*
Bryan K. Webb
  *Deputy Attorney General*
Georgia Department of Law
40 Capitol Square SW
Atlanta, Georgia, 30334
404-458-3408
spetrany@law.ga.gov
bwebb@law.ga.gov

Respectfully submitted,

/s/ Patrick Strawbridge
Patrick Strawbridge
Consovoy McCarthy PLLC
Ten Post Office Square
8th Floor South PMB #706
Boston, MA 02109
(617) 227-0548
patrick@consovoymccarthy.com

Frank H. Chang
Soren Geiger
Consovoy McCarthy PLLC
1600 Wilson Blvd., Suite 700
Arlington, VA 22209
(703) 243-9423
frank@consovoymccarthy.com
soren@consovoymccarthy.com

## CERTIFICATE OF COMPLIANCE

This motion complies with Rule 32(a)(7) because it contains 12,555 words, excluding the parts that can be excluded. This motion also complies with Rule 32(a)(5)-(6) because it is prepared in a proportionally spaced face using Microsoft Word 2016 in 14-point Garamond font.

Dated: June 11, 2025                              */s/ Patrick Strawbridge*

## CERTIFICATE OF SERVICE

I filed this brief on the Court's electronic filing system, which will email everyone requiring notice.

Dated: June 11, 2025                              */s/ Patrick Strawbridge*