No. 25-11114

**IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT**

ISAAC A., by and through next friend, A.A.; ZACH B., by and through next friend, B.B.; LEON C., by and through next friend, C.C.; SAMUEL D., by and through next friend, D.D., on behalf of themselves and those similarly situated; and THE GEORGIA ADVOCACY OFFICE,

*Plaintiffs-Appellees*,

v.

DEAN BURKE, in his official capacity as Commissioner of the Georgia Department of Community Health; KEVIN TANNER, in his official capacity as Commissioner of the Georgia Department of Behavioral Health and Developmental Disabilities; and CANDICE L. BROCE, in her official capacity as the Commissioner of the Georgia Department of Human Services,

*Defendants-Appellants*.

On Appeal from the United States District Court for the Northern District of Georgia, No. 1:24-cv-00037 (Totenberg, J.)

**REPLY BRIEF OF DEFENDANTS-APPELLANTS**

Christopher M. Carr
*Attorney General*
Bryan K. Webb
*Deputy Attorney General*
John Henry Thompson
*Solicitor General*
Georgia Department of Law
40 Capitol Square SW
Atlanta, Georgia, 30334
(404) 458-3408

Patrick Strawbridge
Consovoy McCarthy PLLC
265 Franklin St., Suite 1702
PMB A189
Boston, MA 02109
(617) 227-0548
patrick@consovoymccarthy.com

Frank H. Chang
Soren Geiger
Consovoy McCarthy PLLC
1600 Wilson Blvd., Suite 700
Arlington, VA 22209
(703) 243-9423

# TABLE OF CONTENTS


Introduction .......... 1

Argument .......... 2

- I. Plaintiffs' claims are moot. .......... 2
  - A. Georgia's amended Medicaid program provides services designed to reduce residential treatment for vulnerable youth. .......... 3
  - B. Constitutional mootness requires dismissal. .......... 7
  - C. Prudential mootness requires dismissal. .......... 10
  - D. The voluntary cessation exception does not apply. .......... 14
- II. Sovereign immunity bars Plaintiffs' Medicaid and ADA claims. .......... 15
- III. Plaintiffs lack standing and fail to state claims for relief. .......... 20

Conclusion .......... 23

## TABLE OF AUTHORITIES

**Cases**

*A.L. Mechling Barge Lines v. United States*,
368 U.S. 324 (1961) .......... 11, 13

*Ala. Hosp. Ass'n v. Beasley*,
702 F.2d 955 (11th Cir. 1983) .......... 8, 14

*Am. Charities for Reasonable Fundraising Regul. v. O'Bannon*,
909 F.3d 329 (10th Cir. 2018) .......... 8

*Beta Upsilon Chi Upsilon Ch. at the Univ. of Fla. v. Machen*,
586 F.3d 908 (11th Cir. 2009) .......... 3, 14

*Boglin v. Bd. of Trustees of Ala. Agric. & Mech. Univ.*,
290 F. Supp. 3d 1257 (N.D. Ala. 2018) .......... 16

*Bone v. Univ. of. N.C. Health Care Sys.*,
678 F. Supp. 3d 660 (M.D.N.C. 2023) .......... 11

*Bryant v. Avado Brands, Inc.*,
187 F.3d 1271 (11th Cir. 1999) .......... 2

*Burford v. Sun Oil Co.*,
319 U.S. 315 (1943) .......... 11

*Burns-Vidlak by Burns v. Chandler*,
939 F. Supp. 765 (D. Haw. 1996) .......... 8

*Cambridge Christian Sch. v. Fla. High Sch. Athletic Ass'n*,
115 F.4th 1266 (11th Cir. 2024) .......... 7, 10, 14, 15

*Chamber of Com. v. Dep't of Energy*,
627 F.2d 289 (D.C. Cir. 1980) .......... 11, 13, 14

*City of S. Miami v. Governor*,
65 F.4th 631(11th Cir. 2023) .......... 21

*Coal. for the Abolition of Marijuana Prohibition v. City of Atlanta*,
219 F.3d 1301 (11th Cir. 2000) .......... 7

*Democratic Exec. Comm. of Fla. v. Nat'l Republican Senatorial Comm.*,
950 F.3d 790 (11th Cir. 2020) .......... 3

*Diffenderfer v. Central Baptist Church of Miami, Fla.*,
404 U.S. 412 (1972) .......... 3, 8

*Doe v. Chiles*,
136 F.3d 709 (11th Cir. 1998) .......... 20

*Douglas v. Indep. Living Ctr. of S. Cal.*,
565 U.S. 606 (2012) ....................................................................................4

*Eaves v. Polis*,
167 F.4th 1304 (10th Cir. 2026) .................................................................. 11

*Fams. & Youth Inc. v. Maruca*,
156 F. Supp. 2d 1245 (D.N.M. 2001) ...............................................8, 12, 13

*Farmworker Ass'n of Fla. v. DeSantis*,
2023 WL 8878306 (S.D. Fla. Dec. 21)........................................................ 16

*Flanigan's Enters. of Ga. v. City of Sandy Springs*,
868 F.3d 1248 (11th Cir. 2017)......................................................................3

*Freyre v. Chronister*,
910 F.3d 1371 (11th Cr. 2018)...................................................................... 20

*Green v. Mansour*,
474 U.S. 64 (1985) ....................................................................................... 16

*Hall v. Sec'y, Ala.*,
902 F.3d 1294 (11th Cir. 2018)......................................................................3

*Hudson v. Hall*,
231 F.3d 1289 (11th Cir. 2000)..................................................................... 22

*Ingaseosas Int'l v. Aconcagua Investing*,
479 F. App'x 955 (11th Cir. 2012) ...........................................................3, 11, 13

*J.S. ex rel. J.S. v. Hou. Cnty. Bd. of Educ.*,
877 F.3d 979 (11th Cir. 2017) ..................................................................... 22

*Jackson v. Humphrey*,
776 F.3d 1232 (11th Cir. 2015)..................................................................... 22

*M.H. by and through Lynah v. Comm'r of Georgia DCH*,
111 F.4th 1301 (11th Cir. 2024) ..........................................................18, 19

*McCullough v. Finley*,
907 F.3d 1324 (11th Cir. 2018)..................................................................... 20

*Mi Familia Vota v. Abbott*,
977 F.3d 461 (5th Cir. 2020) ........................................................................ 17

*Moore ex rel. Moore v. Reese*,
637 F.3d 1220 (11th Cir. 2011)..............................................................19, 21

*Ne. Fla. Ch. of Associated Gen. Contractors of Am. v. City of Jacksonville, Fla.*,
508 U.S. 656 (1993) ................................................................................. 7, 8

*Olmstead v. L.C. ex rel Zimring*,
527 U.S. 581 (1999) ... 23

*Paez v. Mulvey*,
915 F.3d 1276 (11th Cir. 2019) ... 22

*Princeton Univ. v. Schmid*,
455 U.S. 100 (1982) ... 8

*Resurrection Sch. v. Hertel*,
35 F.4th 524 (6th Cir. 2022) ... 3

*S. Utah Wilderness All. v. Smith*,
110 F.3d 724 (10th Cir. 1997) ... 11

*S-1 v. Spangler*,
832 F.2d 294 (4th Cir. 1987) ... 11

*Schultz v. Alabama*,
42 F.4th 1298 (11th Cir. 2022) ... 20, 21

*Smith v. LePage*,
834 F.3d 1285 (11th Cir. 2016) ... 22

*Summit Med. Assocs. v. Pryor*,
180 F.3d 1326 (11th Cir. 1999) ... 16, 20

*Tillis on behalf of Wuenschel v. Brown*,
12 F.4th 1291 (11th Cir. 2021) ... 22

*United States v. Florida*,
172 F.4th 1201 (11th Cir. 2026) ... 21, 23

*United States v. Georgia*,
778 F.3d 1202 (11th Cir. 2015) ... 3

*United States v. W.T. Grant Co.*,
345 U.S. 629 (1953) ... 7

*Wade v. Fla. Dep't of Juv. Just.*,
745 F. App'x 894 (11th Cir. 2018) ... 22

*Williams v. Davis*,
2023 WL 119452 (5th Cir. Jan. 6) ... 21

*Winzler v. Toyota Motor Sales U.S.A.*,
681 F.3d 1208 (10th Cir. 2012) ... 2, 12, 13, 15

*WWH v. Jackson*,
13 F.4th 434 (5th Cir. 2021) ... 21

*WWH v. Jackson*,
595 U.S. 30 (2021) ..................................................... 16

**Statutes**

42 CFR §430 ..................................................... 4

42 CFR §441 ..................................................... 18

42 CFR §447 ..................................................... 4, 15

42 USC §1396 ..................................................... 15

O.C.G.A. §49-4-159 ..................................................... 18

O.C.G.A. §49-4-169 ..................................................... 17, 18

O.C.G.A. §49-5-8 ..................................................... 18

**Rules**

CMS, Georgia State Plan Amendment 25-0007, https://www.medicaid.gov/medicaid-spa/2025-09-30/185356 (accessed Oct. 2, 2026) ..................................................... 2, 3, 4, 5, 6, 7, 10

Georgia DCH, Public Notices, State Plan Amendment: Therapeutic Care Model Public Notice, https://bit.ly/4hdz4JX (accessed Oct. 2, 2026) ..................................................... 4

Georgia Medicaid, Medicaid State Plan, https://bit.ly/4AjeYGU (accessed Oct. 2, 2026) ..................................................... 4, 6, 10

## INTRODUCTION

At the time Plaintiffs filed suit in January 2024, Georgia met the mental health needs of Medicaid-eligible children with a bevy of covered services, including Intensive Customized Care Coordination, Intensive Family Intervention, and Georgia Crisis Access Line. Plaintiffs alleged that the Medicaid Act, Americans with Disabilities Act, and Rehabilitation Act required Georgia to adopt three new services: Intensive Care Coordination, Intensive In-Home Services, and Mobile Crisis Response—collectively referred to by Plaintiffs as the "Remedial Services." Defendants moved to dismiss based on sovereign immunity, standing, and the merits. The through-line was Plaintiffs' failure to allege that any medical professional had ever prescribed the Remedial Services as medically necessary to treat Plaintiffs' mental health conditions. Absent well-pleaded allegations of medical necessity, sovereign immunity bars Plaintiffs claims because Defendants have no enforcement authority to administer medically *unnecessary* services, Plaintiffs lack standing because their injuries cannot be traced to nor redressed by the Commissioners, and Plaintiffs' various claims fall well short of plausibility under *Twombly*/*Iqbal* because "medical necessity" is an element of each. The district court denied the motion, so Defendants noticed an interlocutory appeal as to all claims. The denial of sovereign immunity is immediately appealable and also inextricably intertwined with the issues of standing and Plaintiffs' failure to state a claim.

While this appeal was pending, and after Defendants filed their opening brief, the Centers for Medicare & Medicaid Services approved Georgia's State Plan Amendment adding the Therapeutic Care Model to Georgia's Medicaid State Plan. This federally approved modification fundamentally alters the challenged features of Georgia's

Medicaid program, mooting Plaintiffs' suit. Plaintiffs never mentioned this development in their response brief.

Beyond mootness, the Court should reverse based on sovereign immunity as to the Medicaid Act and ADA claims, and on standing and the merits as to all three claims. Plaintiffs misunderstand the *Ex parte Young* exception to sovereign immunity and fail to substantively engage with Defendants' abrogation, standing, and merits arguments.

This Court should vacate the district court's order and remand with instructions to dismiss as moot or, if not, reverse based on sovereign immunity, standing, and failure to state a claim.

## ARGUMENT

### I. Plaintiffs' claims are moot.

On September 30, 2025—after Defendants filed their opening brief but before Plaintiffs filed theirs—CMS approved Georgia's State Plan Amendment (SPA) adding the Therapeutic Care Model (TCM) to Georgia's Medicaid plan. The TCM is a "community-based program designed to reduce residential treatment for the state's most vulnerable youth in Medicaid." SPA at 6d-1.[1] When fully implemented, the TCM will be available statewide for all Medicaid members under the age of 21 "upon recommendation by a licensed practitioner." *Id.* TCM services are "tailored to align with the specific needs of each" participating child and include four core components and six add-on

---

[1] CMS, Georgia State Plan Amendment 25-0007, https://www.medicaid.gov/medicaid-spa/2025-09-30/185356 (accessed Oct. 2, 2026).

This Court may "take judicial notice of relevant public documents," *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1280 (11th Cir. 1999), including the "contents of an administrative agency's publicly available files," *Winzler v. Toyota Motor Sales U.S.A.*, 681 F.3d 1208, 1213 (10th Cir. 2012) (Gorsuch, J.); *see also* Fed. R. Evid. 201(b); *id.* R. 201(d).

components. *Id.* These components expressly incorporate the central aspects of Plaintiffs' preferred Remedial Services forming the "crux of their complaint." *Diffenderfer v. Central Baptist Church of Miami, Fla.*, 404 U.S. 412, 413 (1972) (dismissing challenge to statute as moot in light of intervening legislation).

The addition of the TCM (which offers additional services and service-delivery mechanism) "materially amends" Georgia's Medicaid plan, rendering moot Plaintiffs' case both as a constitutional and a prudential matter. *United States v. Georgia*, 778 F.3d 1202, 1204 (11th Cir. 2015); *see also Ingaseosas Int'l v. Aconcagua Investing*, 479 F. App'x 955, 962-64 (11th Cir. 2012) (discussing and applying the prudential mootness doctrine). Because the entire case is moot, the appropriate course is to "vacate the judgment of the district court and remand with instructions to dismiss the case as moot." *Hall v. Sec'y, Ala.*, 902 F.3d 1294, 1307 (11th Cir. 2018); *accord Beta Upsilon Chi Upsilon Ch. at the Univ. of Fla. v. Machen*, 586 F.3d 908, 918 (11th Cir. 2009) ("*BYX*"); *Flanigan's Enters. of Ga. v. City of Sandy Springs*, 868 F.3d 1248, 1271 n.24 (11th Cir. 2017).[2]

### A. Georgia's amended Medicaid program provides services designed to reduce residential treatment for vulnerable youth.

On July 3, 2025, the Georgia Department of Community Health submitted SPA 25-0007 to CMS for review and approval. *See* SPA, *supra* n.1, Form CMS-179. The SPA proposed adding the TCM to Geogia's Medicaid State Plan. CMS approved the SPA on

[2] Vacatur is appropriate because nothing live remains before the district court. *See BYX*, 586 F.3d at 918 (remanding from interlocutory appeal with instructions to dismiss as moot based on defendant's policy change); *Resurrection Sch. v. Hertel*, 35 F.4th 524, 527 (6th Cir. 2022) (en banc) ("both this interlocutory appeal and the claim itself are now moot"); *cf. Democratic Exec. Comm. of Fla. v. Nat'l Republican Senatorial Comm.*, 950 F.3d 790 (11th Cir. 2020) (vacatur inappropriate if only the interlocutory order is moot and other claims remain live).

September 30, 2025. *Id.* Federal Medicaid dollars allocated to fund Georgia's TCM services are estimated to approach $15 million for fiscal years 2025 and 2026, *id.*, with Georgia's funding share expected to come in at around $6 million.[3]

A Medicaid State Plan "is a comprehensive written statement submitted by the agency describing the nature and scope of its Medicaid program and giving assurance that it will be administered in conformity" with applicable federal laws and regulations. 42 CFR §430.10.[4] A State must submit an SPA "whenever necessary to reflect … [m]aterial changes in State law, organization, or policy, or in the State's operation of the Medicaid program," *id.* §430.12(c), and "it must receive the agency's approval of the plan and any amendments" before implementation, *Douglas v. Indep. Living Ctr. of S. Cal.*, 565 U.S. 606, 610 (2012). "Before granting approval, the agency reviews the State's plan and amendments to determine whether they comply with the statutory and regulatory requirements governing the Medicaid program." *Id.* A State must also "provide public notice of any significant proposed change in its methods and standards for setting payment rates for services," 42 CFR §447.205(a), and must consider "[i]nput from beneficiaries, providers and other affected stakeholders on beneficiary access to the affected services," *id.* §447.204(a)(2). Georgia provided public notice of its Therapeutic Care Model SPA on January 9, 2025, hosted a public comment session via Zoom on January 15, and took written public comments until January 22. *See* Public Notice, *supra* n.3.

[3] *See* Georgia DCH, Public Notices, State Plan Amendment: Therapeutic Care Model Public Notice, https://bit.ly/4hdz4JX (accessed Oct. 2, 2026).

[4] Georgia's State Plan can be found here. Georgia Medicaid, Medicaid State Plan, https://bit.ly/4AjeYGU (accessed Oct. 2, 2026).

As approved by CMS, the TCM includes four core components and six add-on components. The TCM's modular structure is designed so that these services can be mixed and matched into an individualized treatment plan to provide each participating member "the maximum reduction of physical or mental disability and restoration … to their best possible functional level." SPA at 6d-1, *supra* n.1. By tailoring these services "to align with the specific needs of each member," Georgia aims "to reduce residential treatment for the state's most vulnerable youth in Medicaid." *Id.*

**Core components**

1. Assessment and Treatment Planning—"the process in which a provider engages directly with an individual … to evaluate the person's mental health status." *Id.* This process culminates in the development of "a personalized care plan that includes the physician's diagnosis, specific treatment goals, and details about the type, amount, duration, and frequency of services needed." *Id.*

2. Behavioral Aide—"one-on-one, face-to-face behavior management interventions and stabilization services in home or community settings designed to teach and reinforce behavioral goals through training and direct support." *Id.*

3. Care Coordination—"a supportive process that helps individuals access and navigate substance use, mental health, and medical services to improve their overall functioning and well-being," ensuring that "care is connected, consistent, and tailored to the person's needs." *Id.* at 6d-1 to 6d-2.

4. Peer Support—"structured, scheduled activities that promote socialization, recovery, self-advocacy, development of natural supports, and maintenance of community living skills, by Certified Peer Specialists under the direct supervision of a behavioral

health professional." Medicaid State Plan, Attach. 3.1-A, page 6c-10, *supra* n.4; *see also* SPA at 6d-2, *supra* n.1.

**Add-on components**

1. Rehab Care—occupational, physical, and speech therapies tailored to the needs of the member. SPA at 6d-2, *supra* n.1.

2. Intensive-In Home (IIH) Services—"evidence based mental health/substance abuse service" designed "to diffuse current crisis as a first responder, intervene to reduce likelihood of re-occurrence, ensure linkage to community services and resources, monitor and manage presenting psychiatric and/or additions, provide self-help and living skills for youth and[] work with caregivers in implementation of home-based supports and other rehabilitative supports to prevent out of [home] placement for the child." *Id.*

3. Individual Psychotherapy—"evidence-based trauma-responsive behavioral health services and trauma treatment services." *Id.*

4. Applied Behavioral Analysis (ABA)—several services designed "to address complex behaviors." *Id.*

5. Substance Abuse and Substance Use Disorder Services—numerous services including detoxification services, substantive abuse intensive outpatient program, and addictive diseases support services. *See* Medicaid State Plan, Attach. 3.1-A, pages 6c-3 to 6c-10, *supra* n.4; *see also* SPA at 6d-2, *supra* n.1.

6. Family Therapy—"systemic interactions between the identified individual, staff and the individual's family members directed toward the restoration of functioning of the identified individual/family unit," including "specific clinical

interventions/activities to enhance family roles" and "promote the resiliency of the individual/family unit." SPA at 6d-2, *supra* n.1.

In sum, Georgia's TCM provides many intensive community-based services designed to reduce residential treatment for Georgia's Medicaid-eligible youth. The modular, customizable nature of this model permits licensed practitioners and providers to easily and seamlessly combine services into a single care package. The TCM represents a major change to Georgia's Medicaid program.

### B. Constitutional mootness requires dismissal.

The TCM moots Plaintiffs' suit. One "element" of Article III's "case-or-controversy limitation" "is that the plaintiff's case cannot have become moot." *Cambridge Christian Sch. v. Fla. High Sch. Athletic Ass'n*, 115 F.4th 1266, 1280 (11th Cir. 2024). A case may become moot on appeal when, following some intervening event, the "gravamen of [the plaintiff's] complaint" has "been changed in some fundamental respect." *Coal. for the Abolition of Marijuana Prohibition v. City of Atlanta*, 219 F.3d 1301, 1311 (11th Cir. 2000) (quoting *Ne. Fla. Ch. of Associated Gen. Contractors of Am. v. City of Jacksonville, Fla.*, 508 U.S. 656, 662 (1993). And "for a claim for injunctive relief to remain a live controversy there must 'exist some cognizable danger of recurrent violation, something more than the mere possibility which serves to keep the case alive.'" *Cambridge Christian*, 115 F.4th at 1283 (quoting *United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953)). The same goes for "a claim for declaratory relief," which "becomes moot when there is no longer a substantial controversy" "of sufficient immediacy and reality." *Id.* (internal quotation marks omitted). Ultimately, when an appeal "present[s] a substantially different

controversy from the one the District Court originally decided," the case must be dismissed. *Ne. Fla.*, 508 U.S. at 662 n.3.

Here, Georgia's Medicaid State Plan has "materially changed, fundamentally altering the issues that had been presented in district court." *Am. Charities for Reasonable Fundraising Regul. v. O'Bannon*, 909 F.3d 329, 333 (10th Cir. 2018); *see also Princeton Univ. v. Schmid*, 455 U.S. 100, 103 (1982) (dismissing as moot when regulations were "substantially amended" during appeal); *Ala. Hosp. Ass'n v. Beasley*, 702 F.2d 955, 961 (11th Cir. 1983) (challenge to Alabama's Medicaid reimbursement system rendered moot by amendment to the State's Medicaid Plan); *Burns-Vidlak by Burns v. Chandler*, 939 F. Supp. 765, 767 (D. Haw. 1996) (ADA and Rehabilitation Act claims held moot after Hawaii approved new regulations eliminating the alleged disability discrimination); *Fams. & Youth Inc. v. Maruca*, 156 F. Supp. 2d 1245, 1250 (D.N.M. 2001) (Medicaid Act suit dismissed as moot in part because New Mexico was "in the process of redesigning [its] Medicaid program for delivering behavior health services").

The "crux," *Diffenderfer*, 404 U.S. at 413, or "gravamen," *Ne. Fla.*, 508 U.S. at 662, of Plaintiffs' claims under the Medicaid Act, ADA, and Rehabilitation Act is Georgia's alleged "lack of intensive [home and] community-based services," what Plaintiffs call the "Remedial Services," D.Ct.Doc.1 ¶¶7, 10—namely, Intensive Care Coordination, Intensive In-Home Services, and Mobile Crisis Response. Each of the complaint's four counts turns on this alleged failure to provide the Remedial Services. *See id.* ¶210 (Count I, Medicaid Act: "failed to provide or otherwise arrange for the Remedial Services"); *id.* ¶216 (Count II, Medicaid Act: "failure to ensure the provisions of medically necessary Remedial Services"); *id.* ¶223 (Count III, ADA: "failures to make reasonable

modifications … necessary to provide and arrange for timely access to the Remedial Services"); *id.* ¶231 (Count IV, Rehabilitation Act: "The Children require the Remedial Services to avoid unnecessary segregation.").

Georgia's amended Medicaid State Plan now includes the key features of Plaintiffs' preferred Remedial Services and also adds several additional services that together fundamentally change the factual landscape on which Plaintiffs built their complaint. Crucially, the TCM is designed so that its various services can be combined into a highly personalized package, providing each participating member with the care he or she needs to avoid residential treatment and achieve the best possible level of function. As charted below, the features of the Remedial Services touted by Plaintiffs match up fairly closely with the TCM's components.

| **Intensive Care Coordination** | **TCM** |
| --- | --- |
| "assessment and service planning,"<br>"accessing and arranging for services"<br>"coordinating multiple services"<br>"access to crisis services"<br>"advocating for the child and family"<br>"monitoring progress" | <u>Assessment and Treatment Planning</u>: process of "develop[ing] a personalized care plan that includes the physician's diagnosis, specific treatment goals, and details about the type, amount, duration, and frequency of services needed"<br>TCM allows "for the provision of various core and add-on components"<br><u>Care Coordination</u>: "ensures that care is connected, consistent, and tailored to the person's needs" |

| **Intensive In-Home Services** | **TCM** |
| --- | --- |
| "individual and family therapy"<br>"skills training"<br>"behavioral interventions" | <u>IIH</u>: expressly included in model<br><u>Behavioral Aide</u>: "behavior management interventions and stabilization services … through training and direct support" |

| | |
|---|---|
| | Family Therapy: "cognitive processing skills," "adaptive behaviors and skills," "interpersonal skills," and instruction in "methods of intervention" |

| **Mobile Crisis Response** | **TCM** |
|---|---|
| crisis resolution assistance<br>crisis prevention training | IIH: "diffuse current crisis as a first responder" and "intervene to reduce likelihood of re-occurrence"<br>Applied Behavioral Analysis: addresses complex behaviors<br>Family Therapy: instruction in "methods of intervention"<br>Peer Support: "guidance, encouragement, and practical assistance" training |

D.Ct.Doc.1 ¶¶147, 162, 171-73; *see also* SPA at 6d-1 to 6d-3, *supra* n.1; Georgia Medicaid State Plan, Attach. 3.1-A at 6(a)(2) to 6(a)(5), *supra* n.4 (listing services included in TCM's Applied Behavioral Analysis component).

In sum, Plaintiffs demand new intensive home and community-based services, and the TCM adds those services and many more. The TCM has thus "deprive[d] the court of the ability to give" Plaintiffs "meaningful relief." *Cambridge Christian*, 115 F.4th at 1283. This Court should instruct the district court to dismiss the case as moot.

### C. Prudential mootness requires dismissal.

Even if this Court determines that the case is "not actually moot" under Article III, it should exercise its discretion to order the case's dismissal in accordance with the prudential mootness doctrine, which applies when a case becomes "so attenuated that considerations of prudence and comity for coordinate branches of government counsel

the court to stay its hand, and to withhold relief it has the power to grant."[5] *Chamber of Com. v. Dep't of Energy*, 627 F.2d 289, 291 (D.C. Cir. 1980) (per curiam); *S-1 v. Spangler*, 832 F.2d 294, 297 (4th Cir. 1987) ("The discretionary power to withhold injunctive and declaratory relief for prudential reasons, even in a case not constitutionally moot, is well established."). Prudential mootness has "particular applicability … where the relief sought is an injunction against the government." *S. Utah Wilderness All. v. Smith*, 110 F.3d 724, 727 (10th Cir. 1997). In short, where "it is uncertain" that an injunction "will benefit the party alleging injury, the court will normally refrain from exercising its equitable powers." *Ingaseosas Int'l v. Aconcagua Investing*, 479 F. App'x 955, 963 (11th Cir. 2012) (internal quotation marks omitted).

Courts should especially refrain from enjoining or declaring a state practice invalid "where it appears that a challenged 'continuing practice' is, at the moment adjudication is sought, undergoing significant modification so that its ultimate form cannot be confidently predicted." *A.L. Mechling Barge Lines v. United States*, 368 U.S. 324, 331 (1961). And where "the state appears to be acting in good faith to address the issue at hand," courts must be wary of granting relief expansive and invasive in scope. *Bone v. Univ. of. N.C. Health Care Sys.*, 678 F. Supp. 3d 660, 704-05 (M.D.N.C. 2023); *see also Burford v. Sun Oil Co.*, 319 U.S. 315, 318 (1943) ("federal courts of equity should exercise their discretionary power with proper regard for the rightful independence of state governments in carrying out their domestic policy").

---

[5] Application of prudential mootness is appropriate in this interlocutory posture. *Cf. Eaves v. Polis*, 167 F.4th 1304, 1311-13 (10th Cir. 2026).

Then-judge Gorsuch, expounding upon and applying the prudential mootness doctrine, dismissed a product liability suit for injunctive relief against Toyota after Toyota initiated a nationwide recall. *See Winzler v. Toyota Motor Sales USA, Inc.*, 681 F.3d 1208 (10th Cir. 2012) (Gorsuch, J.). *First*, the court explained that because "claims for equitable relief" "appeal to the 'remedial discretion' of the courts," when "events so overtake a lawsuit that the anticipated benefits of a remedial decree no longer justify the trouble of deciding the case on the merits, equity may demand not decision but dismissal." *Id. Second*, the court emphasized that prudential mootness advances principles of comity "because affording a judicial remedy on top of one already promised by a coordinate branch risks needless inter-branch disputes over the execution of the remedial process and the duplicative expenditure of finite public resources." *Id.* at 1211. *Third*, since "there's often no one single right way to go about providing equitable relief," prudential mootness counsels courts not to "presume deficiency from difference" between the relief "that might be included in a judicial decree" and that which the State's action affords the plaintiff. *Id.* at 1214.

Earlier, in *Families & Youth Inc. v. Maruca*, the court applied these principles when dismissing on the pleadings a challenge to New Mexico's Medicaid program. 156 F. Supp. 2d at 1250. Plaintiffs alleged that the Medicaid Act prohibited New Mexico's planned transition from a "lump sum" payment structure for health services to a "fee-for-service" system. *Id.* at 1247. While the suit was pending, HHS extended its waiver for New Mexico to continue under the lump sum model for another year. *Id.* at 1248. New Mexico moved to dismiss on mootness grounds. *Id.* at 1249. The court granted the motion, holding that it would "refrain from exercising its authority" in part because

New Mexico was "currently in the process of redesigning the New Mexico Medicaid program for delivering behavior health services," with the "final contours of the managed care program have yet to be determined." *Id.* at 1250. Interference with the State's efforts "to revamp the New Mexico Medicaid system with input from beneficiaries, providers and consumer advocates" could "hamper current attempts to improve the program." *Id.* at 1251. Under those circumstances, the Court refused "to meddle in such a classically state function." *Id.*

This Court should likewise recognize that, given the approval and ongoing implementation of the TCM, "there remains not enough value left for the courts to add in this case to warrant carrying on with the business of deciding its merits." *Winzler*, 681 F.3d at 1211. The controversy that once existed has become so "attenuated," *Chamber of Com.*, 627 F.2d at 291, that a remedial order from the district court would risk "duplicative" results, wasting resources and generating unnecessary interference with Georgia's efforts to improve its Medicaid program, *Winzler*, 681 F.3d at 1211. Without dispute, the State Plan is "undergoing significant modification," *Mechling Barge*, 368 U.S. at 331, and while the TCM may vary slightly from Plaintiffs' preferred Remedial Services, it would be inappropriate for this court or the district court at this stage to "presume deficiency from difference," *Winzler*, 681 F.3d at 1214. At worst, it is "uncertain" whether an injunction and declaratory judgment will benefit Plaintiffs. That uncertainty counsels strongly in favor of dismissal. *Ingaseosas Int'l*, 479 F. App'x at 963.[6] Plaintiffs

[6] Dismissal is warranted because the alleged "threat of future harm" has "dissipate[d]." *Adler v. Duval Cnty. Sch. Bd.*, 112 F.3d 1475, 1477 (11th Cir. 1997). The TCM renders the "prospect of future injury" "speculative," and Plaintiffs have not attempted to show a "likelihood of substantial and immediate irreparable injury." *Gagliardi v. TJCV*

will have "ample opportunity" "to renew their complaint" in the event they believe the State's amended Medicaid plan falls short of fixing the alleged inadequacies of the old plan. *Chamber of Commerce*, 627 F.2d at 292. But at this point, given the State's efforts toward expanding the universe of services available under Georgia's Medicaid program, this Court should instruct the district court to interfere no further and dismiss the case as moot.

### D. The voluntary cessation exception does not apply.

The voluntary cessation exception to mootness cannot keep this case live. "In cases where government policies have been challenged, the Supreme Court has held almost uniformly that voluntary cessation of the challenged behavior moots the claim." *BYX*, 586 F.3d at 917. When the government materially changes a challenged policy, "the burden shifts to the plaintiff" to "show a 'reasonable expectation' (or 'substantial likelihood') that the government defendant will 'reverse course' and reinstate the repealed policy if the lawsuit is terminated." *Cambridge Christian*, 115 F.4th at 1284. "The mere possibility" that Georgia "might rescind the amendment" (and that CMS might approve the rescission) "does not, for purposes of mootness, enliven the controversy." *Ala. Hosp. Ass'n*, 702 F.2d at 961. To determine whether plaintiffs meet their burden, courts examine three factors: "(1) 'whether the change in conduct resulted from substantial deliberation or is merely an attempt to manipulate our jurisdiction'; (2) whether the decision to end the challenged conduct was 'unambiguous' and can be 'fairly viewed

*Land Tr.*, 889 F.3d 728, 734 (11th Cir. 2018). Thus, "prolonging the litigation any longer would itself be inequitable." *Winzler*, 681 F.3d at 1210; *see also Mechling Barge*, 368 U.S. at 331 ("Nor need this Court first have the view of a lower court before it may decide that such discretion ought not be exercised.").

as being permanent and complete'; and (3) 'whether the government has consistently maintained its commitment to the new policy.'" *Cambridge Christian*, 115 F.4th at 1284.

Plaintiffs have made no effort to satisfy their burden despite having had notice of the federally approved SPA since well before they filed their opening brief. Regardless, the factors easily demonstrate that the voluntary cessation exception has no application here. *First*, the federally regulated process of amending a Medicaid State Plan demands serious and "substantial deliberation." *Id.*; *see supra* nn.1, 3; 42 CFR §§447.204, 447.205(a). There can be no suggestion that Georgia jumped through all of CMS's hoops just to try to manipulate this Court's jurisdiction. *Second*, an amendment to the Medicaid State Plan is, by definition, "unambiguous," "permanent," and "complete." *Cambridge Christian*, 115 F.4th at 1284-85. *Third*, Georgia has demonstrated its "commitment to the new policy," *id.* at 1268, by "subject[ing] itself to the continuing oversight of (and potential penalties imposed by)" CMS, *see Winzler*, 681 F.3d at 1211; *see also* 42 USC §1396a(a)(8) (covered services must be provided with "reasonable promptness"); *id.* §1396c (consequence of noncompliance with approved SPA is withholding of federal funds). Plaintiffs' case remains moot.

## II. Sovereign immunity bars Plaintiffs' Medicaid and ADA claims.

If the Court proceeds past mootness, it should still reverse based on sovereign immunity. Plaintiffs acknowledge that jurisdiction properly lies in this Court to decide whether the district court erred in rejecting Defendants' invocation of Georgia's Eleventh Amendment immunity. *See* Red Br. at 1, 5-6. Before the district court and this Court, Defendants argued that the Commissioners enjoy the State's immunity from suit, the *Ex parte Young* exception does not apply, and Congress has not abrogated the State's

immunity for Plaintiffs' ADA claim. *See* D.Ct.Doc. 32 at 10-19; Blue Br. at 16-37. Plaintiffs devote their opening brief to the *Ex parte Young* issue, refusing to engage substantively with Defendants' abrogation arguments. *See* Red Br. at 10-22. Given space limitations, and because the *Ex parte Young* issue is sufficient to reverse, Defendants focus here on why that exception to immunity does not apply.

Plaintiffs cannot take advantage of the *Ex parte Young* fiction to prosecute their Medicaid and ADA claims against the Commissioners, who have no authority to provide the relief Plaintiffs demand.[7] Defendants with "no enforcement authority" to give Plaintiffs what they demand are the wrong defendants. *Summit Med. Assocs. v. Pryor*, 180 F.3d 1326, 1329 (11th Cir. 1999). This is not a "merits" issue. *Contra* Red Br. at 11, 12, 14, 15. It is fundamental to the *Ex parte Young* analysis. *See WWH v. Jackson*, 595 U.S. 30, 43 (2021); *see also Boglin v. Bd. of Trustees of Ala. Agric. & Mech. Univ.*, 290 F. Supp. 3d 1257, 1266 (N.D. Ala. 2018) (dismissing complaint against university trustees as barred by sovereign immunity where the plaintiff "failed to plead" "that the individual members of the board are able to directly provide the injunctive relief she requests"); *Farmworker Ass'n of Fla. v. DeSantis*, 2023 WL 8878306, at *11 (S.D. Fla. Dec. 21) (dismissing complaint against Governor DeSantis where Florida law prohibited him from "unilaterally" investigating any of the challenged state criminal laws).

Plaintiffs' entire case centers on Georgia's alleged failure to provide the Remedial Services to Medicaid-eligible youth. Their lead theory is that the Medicaid Act requires

---

[7] Independently, because Plaintiffs' claims have been mooted by CMS's approval of the Therapeutic Care Model SPA, Plaintiffs' allegations fail to identify an "*ongoing* violation of federal law." *Green v. Mansour*, 474 U.S. 64, 67-68 (1985) (*Ex parte Young* exception is "designed to end a *continuing* violation of federal law") (emphasis added).

DCH Commissioner Burke to provide the Remedial Services (Count I), and to do so with "reasonable promptness" (Count II). D.Ct.Doc.1 ¶¶208, 210. Their disability discrimination theory is that the ADA requires the Commissioners to modify Georgia's Medicaid program "to provide and arrange for timely access to the Remedial Services." *Id.* ¶223. In Plaintiffs' own words, all their claims "can be remedied through a single injunctive order" requiring the Commissioners to:

> 1) provide and arrange for the Children's timely access to the *Remedial Services*; 2) deliver the *Remedial Services* with the intensity and duration required to avoid unnecessary or prolonged institutionalization; 3) ensure that the Children have access to an adequate statewide network of *Remedial Service* providers; and 4) deliver the *Remedial Services* in the most integrated setting as required by law.

D.Ct.Doc.1 ¶208 (emphasis added). The fatal problem common to Plaintiffs' claims, however, is that the Commissioners have no authority to "provide," "arrange," or "deliver" the Remedial Services unless those services are medically necessary—a critical term defined by Georgia law to encompass only treatments recommended or prescribed by a licensed practitioner. O.C.G.A. §49-4-169.1(4)-(5); *id.* §49-4-169.3(c), (e); *id.* §49-5-8(a)(9). The complaint contains no well-pleaded allegations that any medical professional has ever ordered these services for these Plaintiffs.

Plaintiffs insist that the DCH, DHS, and DBHDD Commissioners are proper defendants merely by virtue of their status as the heads of three state agencies that provide behavioral health services (Medicaid-funded or otherwise) for children in Georgia. *See* Red Br. at 13-14. But statutory "authority to review, approve, or deny" services generally, *see id.* at 14, is not the power to provide the Remedial Services Plaintiffs demand, *see Mi Familia Vota v. Abbott*, 977 F.3d 461, 467-68 (5th Cir. 2020) (identifying

the proper defendant under *Ex parte Young* requires a "more detailed analysis"). DCH Commissioner Burke, for one, has no authority to provide services unless they are "medically necessary"—that is, "prescribed by a physician or other licensed practitioner," "whether or not such services are in the state plan." O.C.G.A. §49-4-169.1(4). DHS Commissioner Broce likewise lacks the power to administer medical services unless they are "considered appropriate and necessary by competent medical authority." *Id.* §49-5-8(a)(9). And DBHDD Commissioner Tanner neither oversees Georgia's Medicaid program (DCH does) nor children under the State's legal custody (DHS does). Moreover, Commissioner Tanner cannot control physicians' medical diagnoses. *Cf.* 42 CFR §§441.152, 441.153. Thus, to use *Ex parte Young* to bypass the State's sovereign immunity, Plaintiffs must allege (at a minimum) that the Remedial Services are medically necessary, as defined by Georgia law to mean "prescribed by a physician or other licensed practitioner," or "considered appropriate and necessary by competent medical authority." O.C.G.A. §§49-4-159.1(4), 49-5-8(a)(9).

The most Plaintiffs allege is that medical professionals sometime in the past referred them to Georgia's *existing* services like IFI or IC3, not that any practitioner ever recommended one or more of the Remedial Services as appropriate to address Plaintiffs' behavioral health conditions. *See* Red Br. at 15, 23 (citing, *e.g.*, D.Ct.Doc.1 ¶¶28, 40, 50, 62). The other complaint paragraphs Plaintiffs highlight merely repeat their own conclusory opinion, not that of a treating physician, that the Remedial Services are "necessary." *See id.* (citing, *e.g.*, D.Ct.Doc.1 ¶¶2, 12, 13, 163, 188, 216, 222).

Plaintiffs mistakenly think *M.H. by and through Lynah v. Comm'r of Georgia DCH*, 111 F.4th 1301 (11th Cir. 2024), and *Moore ex rel. Moore v. Reese*, 637 F.3d 1220 (11th Cir.

2011), support their *Ex parte Young* theory because the DCH Commissioner was a defendant in both. *See* Red Br. at 10. That simplistic *ipso facto* ignores what the cases were about and what they said. *M.H.* and *Moore* both concerned "the extent to which a state Medicaid agency may *review* [a] treating physician's determination of medical necessity." *Moore*, 637 F.3d at 1223 (emphasis added); *M.H.*, 111 F.4th at 1307. Neither held that the DCH Commissioner has authority to adopt and provide services that have not been found medically necessary by a health professional. To the contrary, these cases confirm that "even if the [Medicaid] Act mandates that a state provide a certain kind of 'medical services or treatments,' the state must provide those 'medical services or treatments only if they are medically necessary.'" *M.H.*, 111 F.4th at 1304 (quoting *Moore*, 637 F.3d at 1233) (cleaned up). Thus, to implicate the commissioner's enforcement authority, Plaintiffs needed to plead that the Remedial Services are currently medically necessary as that term is defined by Georgia law. Plaintiffs did not.

Plaintiffs' other examples of courts permitting Medicaid Act and ADA suits to proceed against state officials demonstrate only that Medicaid and ADA suits *can*, in some circumstances, proceed under *Ex parte Young*—not that the Commissioners are the proper defendants in this or in every federal challenge to Georgia's Medicaid program. *Contra* Red Br. at 11-12.[8] If Plaintiffs had sufficiently pleaded medical necessity,

---

[8] Moreover, these cases decided immunity issues not presented here. *See, e.g.*, *Antrican v. Odom*, 290 F.3d 178, 191 (4th Cir. 2002) (rejecting argument that Medicaid Act claim involved "discretionary, not ministerial, acts by State officials"); *Rosie D. ex rel. John D. v. Swift*, 310 F.3d 230, 237 (1st Cir. 2002) (rejecting argument that Medicaid Act possessed an "intricate remedial scheme" sufficient to preempt actions under *Ex parte Young*); *Miller v. King*, 384 F.3d 1248, 1264 (11th Cir. 2004), *vacated* 449 F.3d 1149 (11th Cir. 2006) (merely stating the general rule that the Eleventh Amendment does not outright "bar ADA suits under Title II for prospective injunctive relief against state officials

then perhaps their Medicaid and ADA claims might come closer to "fit[ting] neatly within the *Ex parte Young* exception." *Doe v. Chiles*, 136 F.3d 709, 720 (11th Cir. 1998). But because they did not, Plaintiffs have also not identified the correct Defendants with the authority to provide the relief they seek. Having failed to sufficiently allege the Remedial Services are medically necessary, Plaintiffs' claims cannot proceed under *Ex parte Young* and are thus barred by the State's sovereign immunity.

## III. Plaintiffs lack standing and fail to state claims for relief.

As Defendants have explained before, *see* ECF 32 at 8-18, Blue Br. at 37, 43, the issues of standing and Plaintiffs' failure to state claims under the Medicaid Act, ADA, and Rehabilitation Act are "inextricably intertwined" with the issue of sovereign immunity, *Schultz v. Alabama*, 42 F.4th 1298, 1313 (11th Cir. 2022); *see also McCullough v. Finley*, 907 F.3d 1324, 1330 (11th Cir. 2018). The failure to sufficiently plead medical necessity is dispositive on all fronts. In addition to finding that Defendants are immune from Plaintiffs' Medicaid Act and ADA claims, this Court should hold that Plaintiffs lack standing and fail to plausibly state claims for relief as to all three claims.

**A.** Plaintiffs do not substantively engage with Defendants' standing arguments (nor did they in their response to the Court's jurisdictional question, *see* ECF 31). Instead, they wrongly assert that the "questions" of standing and immunity are not inextricably intertwined as a matter of law. *See* Red Br. at 21-22. To be sure, the two issues are not *always* intertwined. *See, e.g.*, *Freyre v. Chronister*, 910 F.3d 1371, 1379 (11th Cr. 2018); *Summit Med.*, 180 F.3d at 1335. But sometimes they are. *See, e.g.*, *Schultz*, 42 F.4th

---

in their official capacities"); *McCarthy ex rel. Travis v. Hawkins*, 381 F.3d 407, 413 (5th Cir. 2004) (rejecting argument that "only public entities can be sued under" the ADA).

at 1313; *see also WWH v. Jackson*, 13 F.4th 434, 446 (5th Cir. 2021); *Williams v. Davis*, 2023 WL 119452, at *3 (5th Cir. Jan. 6). Here, whether the Commissioners are proper defendants under *Ex parte Young* and whether Plaintiffs' alleged injuries are traceable to the Commissioners and redressable by an order against the Commissioners turn on the same "question" (*contra* Red Br. at 22): Do the Commissioners possess any enforcement authority to adopt and provide services under the State's Medicaid program that have not been deemed medically necessary by a licensed professional? *See* ECF 32 at 10-13; *see also City of S. Miami v. Governor*, 65 F.4th 631, 644 (11th Cir. 2023) (looking to *Ex parte Young* caselaw when deciding redressability). Under Georgia law, the answer is "no." Plaintiffs' alleged injuries are traceable to their doctors, if anyone, not the Commissioners, *see* Blue Br. at 37-40, and an injunction against the Commissioners would do nothing to redress Plaintiffs' purported injuries, *see id.* at 40-42.

**B.** Nor do Plaintiffs substantively engage with Defendants' arguments that Plaintiffs fail to state plausible claims under the Medicaid Act, ADA, and Rehabilitation Act. Plaintiffs instead contend they actually did plead medical necessity, *see* Red Br. at 23-24, that the sufficiency of their Rehabilitation Act claim is untouchable in this interlocutory posture, *see* Red Br. at 24-25, and that their ADA claim survives Defendants' 12(b)(6) challenge in light of *United States v. Florida*, 172 F.4th 1201 (11th Cir. 2026), *see* Red Br. at 25-26. As explained above, *see supra* II, Plaintiffs did not sufficiently plead medical necessity. That failure takes care of Plaintiffs' lead claim because the Medicaid Act can require Georgia to provide medical services "only if they are medically necessary" as that term is defined by Georgia law. *Moore*, 637 F.3d at 1233, 1248, 1255; *see also* Blue Br. at 43-46.

Next, this Court may absolutely rule on Plaintiffs' Rehabilitation Act claim. Indeed, courts routinely exercises pendent appellate jurisdiction over claims that involve "essentially 'the same facts and the same law.'" *Smith v. LePage*, 834 F.3d 1285, 1292 (11th Cir. 2016).[9] As Plaintiffs acknowledge (at 24), their Rehabilitation Act claim is coextensive with their ADA claim. *See J.S. ex rel. J.S. v. Hou. Cnty. Bd. of Educ.*, 877 F.3d 979, 985 (11th Cir. 2017); *Wade v. Fla. Dep't of Juv. Just.*, 745 F. App'x 894, 896 (11th Cir. 2018). To reject Plaintiffs' deficient ADA claim but refuse to rule on their identically deficient Rehabilitation Act claim would run counter to this Court's well-settled practice, undermine this Court's jurisdiction, and frustrate judicial economy. *See* ECF 32 at 18-20.

Finally, Plaintiffs' ADA claim fails under any theory (*Olmstead*, at-risk, or co-occurring discrimination) for the simple and straightforward reason that the ADA cannot require Georgia to create new—and here, medically unnecessary—entitlement benefits, which is precisely what Plaintiffs demand. Remarkably, Plaintiffs assure the Court that their "ADA claims do not seek to compel Georgia to create new Medicaid benefits," only "reasonable modifications to existing service systems." Red Br. at 15-16. Plaintiffs are more forthright in their complaint, where they allege that the ADA requires Georgia to make modifications "necessary to provide and arrange for timely access to the *Remedial Services*." D.Ct.Doc.1 ¶223 (emphasis added); *see also id.* ¶188

[9] *See also, e.g.*, *Paez v. Mulvey*, 915 F.3d 1276, 1291-92 (11th Cir. 2019); *Tillis on behalf of Wuenschel v. Brown*, 12 F.4th 1291, 1297-98 (11th Cir. 2021); *Jackson v. Humphrey*, 776 F.3d 1232, 1239 (11th Cir. 2015); *Hudson v. Hall*, 231 F.3d 1289, 1293-94 (11th Cir. 2000).

("access to the Medicaid-funded Remedial Services is a reasonable and readily achievable modification"). Plaintiffs plainly demand new services.[10]

This Court's recent decision in *United States v. Florida* correctly recognizes that, under the ADA, "a state may not be forced to create a community-treatment program where none exists." 172 F.4th at 1237 (quoting *Olmstead v. L.C. ex rel Zimring*, 527 U.S. 581, 613 (1999) (Kennedy, J.)); *accord id.* at 1245. The Court emphasized that the Florida plaintiffs' ADA claim did not violate that prohibition because it "call[ed] for expanding access to State services that already exist, and for using existing State programs and tools of program administration to expand such access." *Id.* at 1237.[11] Not so here. Plaintiffs' demand for new services forecloses their ADA claim under any theory.

## CONCLUSION

For these reasons, the Court should vacate the district court's order and remand with instructions to dismiss as moot, or, if not, reverse based on sovereign immunity, standing, and failure to state claims for relief.

[10] Again, because the amended TCM provides services focused on reducing residential treatment, Plaintiffs' ADA claim is moot. *See supra* I.A.

[11] In *Florida*, the United States asked this Court to grant Florida's en banc petition and vacate the panel decision after stating that the *Olmstead* Guidance that gave rise to the at-risk theory has no force of law. Mot. to Vacate Panel Opinion, No. 23-12331 (11th Cir. Aug. 13, 2026). This Court has ordered mediation in that case in light of the government's position.

Dated: October 5, 2026

Respectfully submitted,

*/s/ Bryan K. Webb*
Christopher M. Carr
*Attorney General*
Bryan K. Webb
*Deputy Attorney General*
John Henry Thompson
*Solicitor General*
Georgia Department of Law
40 Capitol Square SW
Atlanta, Georgia, 30334
(404) 458-3408
jhthompson@law.ga.gov
bwebb@law.ga.gov

*/s/ Patrick Strawbridge*
Patrick Strawbridge
Consovoy McCarthy PLLC
265 Franklin St., Suite 1702
PMB A189
Boston, MA 02109
(617) 227-0548
patrick@consovoymccarthy.com

Frank H. Chang
Soren Geiger
Consovoy McCarthy PLLC
1600 Wilson Blvd., Suite 700
Arlington, VA 22209
(703) 243-9423
frank@consovoymccarthy.com
soren@consovoymccarthy.com

## CERTIFICATE OF COMPLIANCE

This motion complies with Rule 32(a)(7) because it contains 6,460 words, excluding the parts that can be excluded. This motion also complies with Rule 32(a)(5)-(6) because it is prepared in a proportionally spaced face using Microsoft Word in 14-point Garamond font.

Dated: October 5, 2026 *_/s/ Patrick Strawbridge_*

## CERTIFICATE OF SERVICE

I filed this brief on the Court's electronic filing system, which will email everyone requiring notice.

Dated: October 5, 2026 *_/s/ Patrick Strawbridge_*